# EXHIBIT A

## IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

| | |
|---|---|
| Avantax Planning Partners, Inc.; and Avantax, Inc. | Court File No. |
| Plaintiffs, | **PETITION AND JURY DEMAND** |
| vs. | |
| Michael Carignan; and Mariner, LLC, d/b/a Mariner Wealth Advisors. | |
| Defendants. | |

COMES NOW, Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. (collectively "Plaintiffs"), and for their cause of action against Defendants state as follows:

## PARTIES

1.      Plaintiff Avantax Planning Partners, Inc. ("Avantax")[1] is an Iowa business corporation with its principal place of business located in Dubuque, Dubuque County, Iowa.

2.      Plaintiff Avantax, Inc. is the parent company of Avantax Planning Partners, Inc. and is a Delaware corporation with its principal place of business located in Dallas, Texas.

3.      Defendant Mariner, LLC, d/b/a Mariner Wealth Advisors ("Mariner") is a Kansas limited liability company with a principal place of business in Overland Park, Kansas, and transacts business in the State of Iowa.

4.      Defendant Michael Carignan ("Carignan") is a citizen and resident of Georgia. Carignan was employed by Avantax from May 20, 2013, to September 29, 2023.

---

[1] On or about January 2021, Plaintiff, formerly known as Honkamp Financial Services, Inc. ("HKFS"), was rebranded as Avantax Planning Partners, Inc.

## BACKGROUND

### Avantax's Business

5.      Avantax, Inc. is a wealth advisory firm founded in 1983 by a CPA to provide financial planning and wealth management services with a tax-focused lens. The firm is a pioneer in the tax-focused financial planning movement and its comprehensive investment services include strategies and solutions in investment, retirement planning, business planning, cash-flow management, family and education planning, and legacy planning.

6.      Avantax, Inc. offers two distinct, but related, models within its business: (1) the independent financial professional model through its subsidiary Avantax Wealth Management and related entities; and (2) the employee-based model, through its subsidiary Avantax Planning Partners, Inc. ("Avantax")[2], which offers services through a registered investment advisory ("RIA") and insurance agency by partnering and collaborating closely with CPA firms ("CPA firm clients") to provide consumer and business clients ("end-user clients") with tax-focused holistic and comprehensive financial planning and advisory services.

7.      Avantax considers as clients both the end-user clients to whom its financial professionals provide wealth management strategies and advice, as well as CPA firm clients with whom its financial professionals collaborate. Avantax provides investment advice, as well as personal and business financial planning and retirement planning, directly to its CPA firm clients and their tax professionals, individually, thereby making those CPA firm clients end-user clients as well. Avantax has proprietary trade secrets, proprietary, and confidential information pertaining to each type of client.

---

[2] Defendant Michael Carignan was an employee serving primarily Plaintiff Avantax Planning Partners, Inc. References to "Avantax" throughout this Petition are to Plaintiff Avantax Planning Partners, Inc. or "APP," unless otherwise specified.

8.      Avantax's niche, tax-focused financial planning service identifies and engages its customer base in a unique way that differentiates Avantax from other financial services firms. Unlike ordinary financial services firms, which rely on each financial professional to solicit their own customers, APP's business model involves strategically developing focused partnerships and relationships between Avantax and CPA firm clients across the United States to provide comprehensive financial planning and wealth management services to end-user clients.

9.      Because of its roots, founded by a CPA, its brand, and the depth of its financial experience, Avantax has developed long-standing relationships with CPA firm clients across the country.  Avantax's financial professionals work closely with the tax professionals with which Avantax partners to identify clients who will benefit from investment strategy and advice. Avantax and CPA firm clients jointly collaborate to provide financial planning and wealth management services by considering each end-user client's financial goals and related tax planning implications. Thus, through the relationships that Avantax has cultivated with CPA firm clients, Avantax's financial professionals can focus their time and energy on servicing the end-user clients of CPA firm clients, rather than spending the otherwise substantial time and resources necessary to source and solicit end-user clients directly.

10.      In this business model, the relationships that Avantax builds with CPA firm clients are a significant and critical source of Avantax's competitive advantage in the marketplace that extends as a benefit to its financial professionals.  Avantax's CPA firm clients have a well-developed client base and, through their relationship with Avantax, are able to provide more holistic and comprehensive financial services to end-user clients. Avantax, in turn, builds upon the trust that CPA firm clients have already established with end-user clients by providing that additional strategic advice and financial planning in collaboration with CPA firm clients' tax and

related planning and advice. This relationship gives Avantax a distinct competitive edge over other financial services firms that have not developed these business relationships with CPA firm clients—a competitive edge that can quickly and permanently disappear if the relationships between Avantax and its CPA firm clients are damaged.

11.     Avantax invests significant time and resources developing relationships with both CPA firm clients as well as the end-user client base that flows from the relationship between Avantax and CPA firm clients, including by developing and maintaining certain trade secrets and other confidential and proprietary information relating to Avantax's business relationships with CPA firm clients and end-user clients. In particular, Avantax prizes its confidential information regarding both its client fee structure and the fees or commissions paid to CPA firm clients. Knowledge of the compensation is highly confidential and is not known to the general public or, more importantly, Avantax's competitors.

12.     If any of Avantax's competitors were given access to this information, it would put that competitor in an unfair competitive advantage because the competitor would have the information needed to unfairly target CPA firm clients and end-user clients by undercutting the fees/commissions charged by Avantax or paid to CPA firm clients. Without such knowledge, Avantax's competitors have struggled to effectively compete for the valuable relationships with CPA firm clients and the end-user client relationships that flow from those relationships.

13.     The importance of the relationship between Avantax and CPA firm clients, and the protection of the trade secrets and confidential information developed by Avantax relating to those relationships, cannot be overstated. When Avantax loses a relationship with a CPA firm client, it also often loses the critical end-user client relationships that flowed from the CPA firm client relationship. Moreover, Avantax also loses the valuable pool of *prospective* end-user clients that

it would have served in collaboration with the CPA firm client over years and years because of the destruction of the underlying relationship with the CPA firm client.

14.    This lost opportunity is immeasurable – it is literally impossible to know the numbers of unidentifiable prospective end-user clients that would have resulted from a continued relationship with the CPA firm client.  That is why it is extremely important for Avantax to protect its relationships with its CPA firm clients from being damaged by, among other things, requiring employees to sign restrictive covenants as a condition of employment that put in place reasonable post-employment restrictions on, among other things, an employee's ability to disclose Avantax's confidential information or solicit Avantax consumer and business clients, including CPA firm clients with which Avantax has developed relationships.

15.    Avantax's trade secrets, proprietary, and confidential information pertaining to CPA firm clients include, but are not limited to: identities of individual contacts; relationship leads or managers; the CPA firm client's business and habits; its business relationships, products, and services (including pricing, costs, sales, and content); the CPA firm client's financial information and measures, business methods, future business plans, short-term and long-term development goals, fee arrangement, commissions, and proprietary partnership strategies; and proposals developed over time to enhance Avantax's relationships with CPA firm clients.

16.    Avantax's trade secrets, proprietary, and confidential information pertaining to end-user clients (both individuals and businesses) include, but are not limited to: identities of current and prospective clients; unique client investment profiles; client needs and requirements, preferences, businesses and habits; business relationships; products and services; sensitive financial information; business methods; future business plans; and the draft wealth plan summaries, recommendations, and strategies developed and considered over years.

17.     Avantax also invests a substantial amount of time and money in developing its relationships with CPA firm clients which may include, but are not limited to: introductory meetings; generation of paperwork; document review; creation of a confidential profile; internal conversations and meetings regarding prospective end-user clients; external and confidential conversations with prospective end-user clients; and other confidential information.

18.     All of this information is extremely valuable to Avantax, unknown to the general public or Avantax's competitors, and the source of Avantax's competitive advantage in the industry.

19.     Avantax goes to great lengths to maintain the secrecy of its trade secrets, proprietary and confidential business information, including by regularly requiring employees to enter into non-solicitation and confidentiality agreements.  Avantax does not provide access to any of its trade secrets or other proprietary and confidential business information to members of the general public, other competitors in its industry, or to non-employees. Furthermore, investor (or end-user) client information is highly regulated in the financial industry, with state, federal, and regulatory requirements mandating confidentiality *independent* of Avantax's employment agreements. In addition, Avantax incurs great expense training and educating its employees in order to ensure compliance with these regulations as well as the highest quality of service to its clients. This training also includes guidance specifically addressing servicing and retaining relationships with the CPA firm clients that are so critical to Avantax's business model.

**Michael Carignan's Employment with Avantax and Access to Confidential Information**

20.     Carignan commenced employment with Avantax on May 20, 2013. Carignan served as a Senior Financial Advisor and later as a Financial Planning Consultant.  He worked in a remote/hybrid basis from both his home in Georgia, and in-person, on location, at CPA firm

6

clients located primarily in Florida, and end-user clients also lived in other states, including Alabama, California, Colorado, Georgia, Idaho, Kansas, North Carolina, and Virginia.

21.     On or around August 21, 2017, Carignan's title changed from Senior Financial Advisor to Financial Planning Consultant ("FPC"). As an FPC, Carignan was entitled to an incentive compensation plan that included revenue sharing for both revenue retention, as well as revenue growth on accounts (including CPA firm client relationships) for which Carignan was the assigned representative.

22.     Carignan served end-user clients, in collaboration with CPA firm clients, primarily by providing financial planning, securities transactions, insurance, and related wealth management services. As an FPC, Carignan's responsibility included serving current and prospective Avantax clients, including CPA firm clients and end-user clients that received the financial planning and other services Avantax provided.  In this role, Carignan was a primary point of contact for Avantax with CPA firm clients that Avantax assigned to him.

23.     As Carignan's incentive compensation included revenue sharing for the accounts he serviced, Carignan benefited directly from the CPA firm client relationships that others at Avantax had cultivated and that were assigned to him for servicing, including maintaining already existing relationships developed between Avantax and its CPA firm clients. The most recent new relationship *given* to Carignan for service occurred in July 2022. That relationship involved a business arrangement in which Avantax purchased and acquired a portion of the CPA firm client's revenue stream.  As part of that arrangement, continued payments by the CPA firm client to Avantax are directly tied to Avantax's retention of the CPA firm client's end-user clients. In other words, the loss of a relationship between Avantax and the end-user client may result in reduction of the number of continuing payments made by the CPA firm client to Avantax.  Carignan paid

for no portion of this business, yet he derived a direct financial benefit from his servicing of the end-user client accounts resulting from Avantax's arrangement with the CPA firm client. Upon information and belief, Carignan, with Mariner's knowledge and support, is soliciting and tortiously interfering with the relationships between Avantax and both the CPA firm client as well as the end-user clients of this particular CPA firm client, legal violations that will cause financial damage to both Avantax and the CPA firm client.

24.     During his employment, Carignan became intimately familiar with proprietary and confidential information of Avantax regarding its clients—both end-user clients and CPA firm clients. Based on the position he held with Avantax and his duties and responsibilities, Carignan had nearly unlimited access to Avantax's trade secrets, proprietary information, and confidential information during his employment.   This information included, but was not limited to, confidential information regarding: Avantax's clients; prospective clients; various investment products; proprietary software; financial and accounting data; marketing strategies; and Avantax's products and services.  Carignan was provided access to Avantax's most sensitive trade secrets and confidential information regarding: Avantax's business and strategic and marketing plans; the CPA firm clients and end-user clients which Avantax paid him to service and maintain relationships; and the terms of Avantax's relationships with CPA firm clients and end-user clients.

25.     Carignan regularly provided services to the clients of Avantax, which required him to, among other things, obtain, collect, and utilize the confidential information of Avantax and the clients of Avantax which he serviced.

26.     In addition, Carignan had access to Avantax's: fee structures and pricing; clients; prospective clients; various investment strategies and terms; financial and accounting data;

marketing strategies; proprietary product review and analysis developed by others at Avantax; and other confidential financial information relating to Avantax's business.

27.     Through his employment and tenure with Avantax, Carignan also regularly attended high-level meetings—including with management, CPA firm clients, and prospective clients, including prospective CPA firm clients—which further granted him access to Avantax's trade secrets, business strategies, proprietary information, and confidential information.

28.     Because of the work Carignan performed for Avantax, and because of the sensitivity of the information to which he had access, Avantax required that he agree to certain confidentiality and non-solicitation provisions.

29.     On July 18, 2016, Carignan signed the Agreement Ancillary to Employment ("Agreement Ancillary") (attached hereto as <u>Exhibit A</u>).  Carignan promised in the Agreement Ancillary to certain restrictions on his use, disclosure, or retention of Avantax's confidential information, as well as restrictions on his solicitation of Avantax clients or employees upon the termination of his employment relationship with Avantax. By signing the Agreement Ancillary, Carignan affirmed his commitment not to solicit CPA firm clients and end-user clients with which he did business and to which he was provided access while an employee of Avantax.

30.     Section 1 of the Agreement Ancillary provides as follows:

1. <u>Non-disclosure of Information</u>. Employee covenants and agrees that he/she will not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to him/her as a result of his/her employment either before or after the date hereof by Employer.  For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to Employer, including, but not be limited to, information relating to such matters as Employer's trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of Employer, pricing practices for Employer's services, marketing and sales practices of Employer, financial information relative to Employer, any other information

which could prove beneficial in enabling a competitor to compete with Employer, and all other information related to Employer's Business.

Employee agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to Employer's operations and business, whether prepared by Employee or not, and all objects associated therewith, including, but not limited to, access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by Employer, are the sole and exclusive property of Employer. Employee shall not, except for Employer use, copy or duplicate any of the aforementioned items, nor remove them from the Employer's facilities, nor use any information concerning them, except for Employer's benefit, either during the term of this Agreement or thereafter. Employee expressly agrees to deliver all of the aforementioned items in his/her possession to Employer on termination of this Agreement, or at any other time on Employer's request, together with Employee's written certification of compliance.

(Exhibit A, ¶ 1.)

31. In addition, Carignan expressly agreed in the Agreement Ancillary to certain restrictions on his ability to solicit certain Avantax clients or employees after his employment had ended. Section 2 of the Agreement Ancillary states:

2. Anti-Piracy Covenants. Employee acknowledges that the services he/she is to render pursuant to this Agreement are of a special character with a unique value to Employer, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Employer of the services of Employee for which Employer has contracted hereunder and because of the confidential information to be obtained by or disclosed to Employee, Employee covenants and agrees as follows:

> a) Notwithstanding and in addition to the above, during Employee's employment and for a period of two years after he/she ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer, any client, account or location of Employer with which Employee has had any contact as a result of his/her employment either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to his/her employment with Employer.
>
> b) During Employee's employment and for a period of two years after he/she ceases to be employed by Employer (for any reason whatsoever), Employee

shall not, directly or indirectly, solicit for employment or employ any employee of Employer, nor shall Employee, directly or indirectly, offer employment or assist any third party in offering employment (whether as an employee or contractor) to an employee of Employer, without the prior written consent of Employer. For purposes of this paragraph 2(b), an "employee of Employer" shall be any employee of Employer as of the date Employee ceases to be employed by Employer or any such employee of Employer who was employed by Employer during the one-year period prior to Employee's termination of employment with Employer.

(Exhibit A, ¶ 2.)

32.    Carignan expressly agreed in the Agreement Ancillary to pay liquidated damages in the event he breached the Agreement Ancillary. Section 3 of the Agreement Ancillary states:

3. Liquidated Damages. Employee agrees that violation of any of the covenants or agreements contained in paragraphs 1 or 2 hereof shall cause damage to Employer, which damage may be difficult to subsequently demonstrate. Consequently, the parties acknowledge and agree that for each breach of this Agreement that results in the loss of one or more of Employer's clients, Employee shall pay liquidated damages, for each and every client lost by Employee's breach of this Agreement, in an amount equal to the regularly occurring annual fee that would have been earned by such lost client (based upon the most recent annual fee for recurring services charged to such client). Additionally, the parties hereto agree and acknowledge that for each breach of paragraph 2(b) herein, Employee shall pay to Employer liquidated damages equal to fifty percent (50%) of the annual compensation paid to such employee during the twelve (12) month period immediately preceding such employee's termination of employment with Employer, or the twelve (12) month period immediately preceding such solicitation of employee, as the case may be. Employee acknowledges that such liquidated damages are fair and reasonable in light of the anticipated or actual loss that would be caused by a breach of this Agreement. The remedies provided for in this paragraph 3 shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Employer is or may be entitled at law or in equity or under this Agreement.

(Exhibit A, ¶ 3.)

33.    The Agreement Ancillary is governed by and interpreted under the laws of the State of Iowa. Section 9 of the Agreement Ancillary expressly states that "[t]he construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa." (Exhibit A, ¶ 9.)

34.     On June 20, 2019, Carignan further agreed to protect Avantax's confidential information by signing an Employee Proprietary Information Agreement ("Proprietary Agreement") (attached hereto as <u>Exhibit B</u>). The Proprietary Agreement states in relevant part:

> 2. <u>Conflicting Employment; Return of Confidential Material</u>
>
> I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge, or data of the Company which I may produce or obtain during the course of my employment.
>
> (<u>Exhibit B</u>, ¶ 2.)

35.     The post-employment restrictions Carignan agreed to in the Agreement Ancillary and the Proprietary Agreement are collectively referred to as the "Restrictive Covenants."

36.     Carignan worked with a team of professionals servicing relationships with CPA firm clients and servicing end-user clients located in Alabama, California, Colorado, Florida, Georgia, Idaho, Kansas, North Carolina, and Virginia.  As a part of this team, Avantax provided training and information to Carignan regarding, among other things: Avantax's business model and its relationships with CPA firm clients; Avantax's clients; Avantax's potential clients; various investment products; financial and accounting data; marketing strategies; and access to Avantax's products and services to help Carignan better serve Avantax clients.

37.     Except for Carignan's signing of the Agreement Ancillary and Proprietary Agreement, including his assent to the Restrictive Covenants set forth therein, Avantax would not have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow Avantax's CPA firm clients.

38.    Avantax assigned Carignan numerous existing CPA firm clients (which included the end-user clients of those CPA firm clients) and provided him with support to recruit additional CPA firm clients to Avantax. Avantax also assigned Carignan to numerous new and developing CPA firm clients so that he could cultivate and grow relationships with those CPA firms and the current and prospective end-user clients.  Carignan was only able to grow and maintain the business with these CPA firm clients due to the access Avantax provided him to its resources and proprietary and confidential information.

39.    The pricing and commission agreements Avantax has with its CPA firm clients are highly confidential, and Carignan would not have had knowledge of this information but for his employment with Avantax. These and the other trade secrets and confidential and proprietary information to which Carignan was granted access are highly valuable and, if he were allowed to solicit Avantax clients, would put Carignan and his new employer in the position of being able to unfairly compete with Avantax for relationships with CPA firm clients and end-user clients by, among other things, offering financial services with more advantageous commission or pricing structures.  That is precisely why Avantax required Carignan to agree to the Restrictive Covenants as set forth in the Agreement Ancillary and Proprietary Agreement.  Again, Avantax would never have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow relationships with CPA firm clients and end-user clients (including the confidential information, trade secrets, and other resources he used to develop client portfolios on behalf of Avantax) if he had not signed the Agreement Ancillary and the Proprietary Agreement.

40.    Carignan was compensated by Avantax throughout his employment to develop, cultivate, maintain, and grow relationships with CPA firm clients and end-user clients on

Avantax's behalf, and his incentive compensation included sharing in revenues generated by CPA firm clients serviced. Despite the fact that Carignan agreed not to solicit CPA firm clients and end-user clients that Avantax paid him to develop and grow, that is exactly what Carignan is currently trying to do – steal Avantax's CPA firm client and end-user client relationships for the benefit of himself and his new employer, all in violation of his contractual and legal obligations to Avantax.

41.     During Carignan's employment with Avantax he routinely attended meetings held in Dubuque, Iowa for the purposes of, among other things, strategic planning.

42.     During the course of his employment Carignan had significant and regular contact with employees at the Dubuque office of Avantax by telephone, email, and text.

43.     Support services were provided by personnel in the Dubuque office of Avantax for Carignan, including, but not limited to, accounting, marketing, reporting, insurance, retirement planning and financial planning support, human resources, and related services.

44.     Jurisdiction and venue are proper in this court given Carignan's contacts with the State of Iowa, and Dubuque County in particular.

**Carignan Abruptly Resigns from Avantax, Immediately Accepts Employment with Mariner, and Begins Unlawfully Soliciting Avantax's Clients**

45.     On Friday, September 29, 2023, at 10:02 a.m., Carignan sent an email to his manager, Aaron Maxey ("Maxey"), with no subject line, but with an attachment, purportedly to notify Maxey that Carignan was immediately terminating his Avantax employment agreements with Avantax.  Upon information and belief, this is a letter that was prepared by Mariner's attorney, as it is virtually identical to letters sent by former Avantax employees who previously resigned their employment with Avantax and were subsequently represented jointly by attorneys for Mariner.

46.     Five minutes later, at 10:07 a.m., Carignan sent a *second* email to Maxey also with no subject line, but with an attachment in which he claimed that he was now immediately terminating his employment and accepting employment with Mariner in Georgia, effective immediately. Additionally, Carignan included contact information for his attorney for "any legal matters that require my attention."[3]

47.     Immediately upon resigning his employment with Avantax, Carignan started his employment with Mariner and began doggedly pursuing Avantax's clients to leave Avantax and move their business to Mariner, including CPA firm clients Avantax *gave* Carignan to service, and through which he received significant primary and bonus compensation.

48.     Upon information and belief, Carignan has engaged in solicitation of CPA firm clients and end-user clients with which he worked at Avantax, with the intention of requesting that such clients cease doing business with Avantax and begin doing business with Mariner. Avantax has learned that Carignan has contacted at least two CPA firm clients he worked with while at Avantax to attempt to steal the relationship from Avantax. One CPA has received a draft agreement from Mariner and calls from Mariner customer service representatives to obtain information needed to set up client accounts at Mariner.  Avantax further has information that Carignan has solicited current end-user clients of Avantax for which Carignan was responsible during his employment with Avantax. Carignan has solicited many Avantax clients in the days since he left. Carignan has already successfully solicited and converted at least 16 Avantax client accounts to Mariner in one week.

---

[3] The undersigned has been advised that this attorney also represents Mariner.

## Mariner is a Direct Competitor to Avantax

49.     Carignan's new employer, Mariner, is a direct competitor of Avantax. Mariner provides services and/or engages in business similar to that of Avantax.

50.     Among other things, Mariner provides: wealth advice; tax planning and preparation; risk management services; investment management; estate planning and trust services; and specialized business services.

51.     Mariner has approximately 89 offices throughout the Unites States, including in Georgia.

52.     Mariner's Georgia location is in Atlanta Georgia, just minutes from an Avantax CPA firm client located in Georgia for which Carignan possessed proprietary and confidential information.

## Carignan Breaches his Agreement Ancillary
## and Proprietary Agreement; Mariner Tortiously Interferes

53.     Carignan is presently employed at Mariner as a Senior Wealth Advisor, a position similar to his former role at Avantax.

54.     Mariner's website now advertises Carignan's employment as a Senior Wealth Advisor at Mariner. Carignan has also already updated his public securities registration with the SEC to Mariner Wealth Advisors (CRD #140195).

55.     Upon information and belief, in his new position with Mariner at its Atlanta branch location, Carignan is performing in the same financial advisory capacity as he did for Avantax, including attempting to solicit CPA client firms with which he worked while employed by Avantax in direct violation of the Agreement Ancillary.

56.     Upon information and belief, since the date of his voluntary resignation from Avantax and his immediate commencement of employment with Mariner, Carignan has relied

upon, used, and disclosed Avantax's trade secrets and other confidential and proprietary information to Mariner, including, but not limited to, information relating to Avantax's CPA firm clients and end-user clients with which Avantax has developed relationships (information to which Carignan would have not been provided access but for his execution of the Agreement Ancillary and the Proprietary Agreement).

57.     On October 20, 2023, Avantax notified Carignan's attorney and Mariner, respectively, by letter of Carignan's Agreement Ancillary and the Proprietary Agreement and his violations of the same (including violations of the confidentiality and non-solicitation provisions contained therein), and demanded that Carignan immediately cease its interference with those contractual obligations.

58.     Despite due notice to Carignan's attorney and Mariner that Carignan's solicitation of Avantax's clients and customers using Avantax's confidential information constitute clear violations of the Agreement Ancillary and the Proprietary Agreement, Mariner, upon information and belief, has allowed and supported Carignan's solicitation of Avantax's clients on its behalf.

59.     Upon information and belief, Carignan continues to contact and solicit Avantax's clients and customers, including those to whom he previously provided services and solicited during his employment with Avantax, in violation of the Agreement Ancillary.

60.     Upon information and belief, Carignan continues to rely upon, use, and disclose (and will in the future reply upon, use, and disclose) Avantax's trade secrets and other confidential and proprietary information to Mariner, in violation of the Agreement Ancillary and the Proprietary Agreement, all with Mariner's support and encouragement, and all with Mariner's knowledge that such activities are contrary to Carignan's contractual obligations owed to Avantax.

61. Carignan's actions are with the knowledge, encouragement, and approval of Mariner. Mariner has not provided any legitimate justification for its intentional and tortious interference with Carignan's contractual obligations owed to Avantax.

62. Jurisdiction and venue are proper in this court given Mariner's contacts with the State of Iowa.

## COUNT I- BREACH OF CONTRACT (CARIGNAN)

63. Avantax restates and incorporates the allegations contained in Paragraphs 1-62 of the Petition as though fully set forth herein.

64. Avantax and Carignan are parties to the Agreement Ancillary and the Proprietary Agreement.

65. All conditions precedent under the Agreement Ancillary and the Proprietary Agreement have occurred.

66. The Agreement Ancillary and the Proprietary Agreement are supported by adequate consideration.

67. The Agreement Ancillary and the Proprietary Agreement are reasonable and enforceable and are necessary to protect Avantax's legitimate business interests in, among other things, its trade secrets, confidential information, client relationships, and customer goodwill.

68. Carignan has breached paragraph 1 of the Agreement Ancillary by, upon information and belief, using confidential information of Avantax to solicit Avantax's CPA firm clients and end-user clients with which Avantax does business.

69. Carignan has breached paragraph 1 of the Agreement Ancillary by, upon information and belief, removing confidential information from Avantax premises without authorization to do so.

70. Carignan has breached paragraph 1 of the Agreement Ancillary by, upon information and belief, retaining copies, or other records, of Avantax, containing confidential information.

71. Carignan has breached paragraph 2 of the Agreement Ancillary by contacting, soliciting, diverting, interfering with, accepting, and/or otherwise attempting to convert Avantax clients (including the CPA firm clients with which Avantax works) in an effort to solicit business from such clients of Avantax on behalf of himself and Mariner for his own financial gain.

72. Carignan has breached the Proprietary Agreement by, upon information and belief, failing to promptly surrender and deliver to Avantax confidential material of Avantax.

73. Avantax lacks an adequate remedy at law for Carignan's breaches of the Agreement Ancillary and Proprietary Agreement and Avantax requires specific performance in the form of injunctive relief to prevent irreparable harm.

74. As a direct and proximate result of the breach of the Agreement Ancillary and Proprietary Agreement by Carignan, Avantax has also been damaged in an amount greater than the jurisdictional threshold of the Iowa District Court.

WHEREFORE, Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. respectfully prays the Court enter judgment on its behalf and against Defendant Michael Carignan, in an amount sufficient to compensate Plaintiffs for their damages, together with interest as allowed by law, the costs of this action, and any other further relief the court deems just and equitable.

## COUNT II- VIOLATION OF IOWA TRADE SECRETS LAW
## (CARIGNAN AND MARINER)

75. Avantax restates and incorporates the allegations contained in Paragraphs 1-74 of the Petition as though fully set forth herein.

76.     Iowa Code Chapter 550 protects the trade secrets and confidential information of Avantax.

77.     The confidential information described in the Agreement Ancillary and the Proprietary Agreement constitute trade secrets protected by Chapter 550 of the Iowa Code. These trade secrets derive independent economic value from not being generally known to, and readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

78.     Avantax has taken efforts that are reasonable to maintain the secrecy of its trade secret information.

79.     Carignan and Mariner have, upon information and belief, misappropriated the trade secrets of Avantax. Carignan and Mariner knew at the time of misappropriation, and continue to know, that the trade secret was acquired by Carignan under circumstances giving rise to a duty to maintain its secrecy or limit its use. Carignan and Mariner further know that the trade secret is derived from Carignan, who owes a duty to maintain Avantax's trade secrets secrecy and is required to limit its use.

80.     Carignan and Mariner have, upon information and belief, acted in a willful and malicious manner in misappropriating the trade secrets of Avantax and therefore should be required to pay exemplary damages to Avantax in an amount to be determined by the court pursuant to Iowa Code Section 550.4.

81.     Carignan and Mariner have acted, upon information and belief, in a willful and malicious manner in misappropriating the trade secrets of Avantax and therefore should be required to pay attorneys' fees to Avantax in an amount to be determined by the court pursuant to Iowa Code Section 550.6.

82.     As a direct and proximate cause of Carignan and Mariner's violations of Iowa Code Chapter 550, Avantax has been damaged in an amount greater than the jurisdictional threshold of the Iowa District Court.

83.     Avantax also seeks injunctive relief pursuant to Iowa Code Section 550.3 as protection of the trade secrets of Avantax is critical in order to prohibit the elimination of a commercial advantage that would be derived from the misappropriation of those trade secrets.

WHEREFORE, Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. respectfully prays the Court enter judgment on its behalf and against Defendants Michael Carignan and Mariner, LLC d/b/a Mariner Wealth Advisors, in an amount sufficient to compensate Plaintiffs for their damages, together with interest as allowed by law, the costs of this action, and any other further relief the court deems just and equitable.

## COUNT III- TORTIOUS INTEFERENCE WITH CONTRACTUAL RELATIONS (MARINER)

84.     Avantax restates and incorporates the allegations contained in Paragraphs 1 through 83 of the Petition as though fully set forth herein.

85.     Avantax and Carignan entered into the Agreement Ancillary and the Proprietary Agreement. The Agreement Ancillary and Proprietary Agreement are valid and enforceable contracts between Carignan and Avantax.

86.     After voluntarily terminating his employment with Avantax, Carignan became employed by Mariner, a direct competitor to Avantax, and began soliciting Avantax clients in violation of the terms of the Agreement Ancillary and Proprietary Agreement.

87.     Mariner has knowledge of the Agreement Ancillary and Proprietary Agreement, including notice by letter dated October 20, 2023.

88.     By employing Carignan and allowing him to violate the Ancillary Agreement and the Proprietary Agreement by, among other things, allowing Carignan to solicit Avantax's CPA firm clients and end-user clients using Avantax's trade secrets and other confidential information, despite knowledge of Carignan's contractual obligations, Mariner has intentionally and improperly interfered with these enforceable contracts between Avantax and Carignan.

89.     By procuring Carignan's breach of the Agreement Ancillary and the Proprietary Agreement – including breach of the confidentiality and non-solicitation provisions – Mariner has interfered with these contracts between Avantax and Carignan and has caused Carignan not to perform as required by the contract.

90.     Mariner's actions are without justification or a proper purpose.

91.     Avantax lacks an adequate remedy at law for Mariner's continuing improper and unjustified interference with the Agreement Ancillary and the Proprietary Agreement, which threatens Avantax with irreparable harm, including loss of business, injury to Avantax's customer goodwill, and disclosure of Avantax's trade secrets and confidential information.

92.     As a result of Mariner's wrongful conduct, Avantax has suffered, and will continue to suffer, damages including present economic loss (including attorney's fees), in excess of the jurisdictional threshold of the Iowa District Court, and future economic loss, which is incalculable, in an amount to be determined at trial.

WHEREFORE, Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. respectfully prays the Court enter judgment on its behalf and against Defendant Mariner, LLC d/b/a Mariner Wealth Advisors, in an amount sufficient to compensate Plaintiffs for their damages, together with interest as allowed by law, the costs of this action, and any other further relief the court deems just and equitable.

## COUNT IV - INJUNCTIVE RELIEF

93.     Avantax restates and incorporates the allegations contained in Paragraphs 1-92 of the Petition as though fully set forth herein.

94.     Avantax lacks an adequate remedy at law for Carignan's breaches of the Agreement Ancillary and the Proprietary Agreement, which threatens Avantax with irreparable harm, including the misappropriation of confidential information, loss of significant business relationships, and injury to customer goodwill.

95.     The Agreement Ancillary and the Proprietary Agreement call for the entry of a restraining order, order of specific performance, or other injunctive relief without showing actual damage and without bond or other security.

96.     The actions of Carignan warrant the issuance of a temporary and permanent injunction enforcing the terms and conditions of the Agreement Ancillary and the Proprietary Agreement.

97.     Should the Court determine that Paragraphs 1 or 2 of the Agreement Ancillary should not be enforced as drafted, then Avantax requests the Court use its equitable powers pursuant to Paragraph 6 of the Agreement Ancillary to reform the restrictions in such a way that the restrictive provisions are made valid and enforceable in order to give effect to the parties' obvious intent.

98.     By reason of the foregoing, Avantax is entitled to damages and injunctive relief restraining Mariner from interfering with the Agreement Ancillary and the Proprietary Agreement.

WHEREFORE, Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. respectfully prays the Court enter a Judgment granting the following relief:

      a)      Entering judgment in Avantax's favor on its Petition and against Carignan awarding an amount sufficient to compensate Avantax for its damages, including

liquidated damages per paragraph 3 of the Agreement Ancillary, together with interest as allowed by law, the costs of this action, and any other further relief the court deems just and equitable.

b)     Entering judgment in Avantax's favor on its claims against Mariner awarding an amount sufficient to compensate Avantax for its damages, together with interest as allowed by law, the costs of this action, and any other further relief the court deems just and equitable.

c)     Entering an order temporarily and permanently enjoining Carignan, Mariner, and all those acting in concert with them from:

(1)     Taking action of any character that results in violation of or interference with the non-solicitation provisions of the Agreement Ancillary, including contacting, soliciting in any way, or accepting business from, whether directly or indirectly, any individual, business, customer, or company whose identity or other information was obtained from Avantax's trade secrets or other confidential or proprietary information, including without limitation the CPA firms with which Carignan worked during his employment with Avantax, for any competing purpose or any purpose detrimental to Avantax's interests, for the period of time as defined in the Ancillary Agreement;

(2)     Taking any action that results in violation the confidentiality provisions of the Agreement Ancillary or the Proprietary Agreement; and

(3)     Taking any action that constitutes a use, disclosure, or misappropriation of Avantax's trade secrets.

d)     Upon a final determination, entering an order requiring Carignan and Mariner to return all trade secret, confidential, or proprietary information, of any nature, owned by Avantax including, but not limited to, any information Mariner may have obtained from Carignan regarding Avantax's clients (including CPA firms with which Carignan worked during his employment with Avantax), customers, or any other confidential business information.

e)     Awarding Avantax compensatory damages in an amount to be proven at trial incurred due to Carignan's breach of contract and violations of the Iowa Trade Secrets Act, and any other damages the Court deems just and necessary.

f)     Awarding Avantax compensatory damages incurred due to Mariner's tortious interference with contract, and any other damages the Court deems just and necessary.

g)     Awarding exemplary damages to Avantax in an amount to be determined by the court pursuant to Iowa Code Section 550.4.

h)     Awarding Avantax all reasonable attorneys' fees incurred in pursuing its claims in this matter, as the Court deems just and proper.

i)      Awarding Avantax its allowable costs, disbursements, and penalties in this matter as the Court deems just and proper.

j)      Directing such other relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

Pursuant to Iowa Rule of Civil Procedure 109.2, Plaintiffs demand a trial by jury on all issues so triable in the case.

Date: October 24, 2023                    */s/ Alenah A. Luthens*
_____

Alenah A. Luthens, AT0015288
aluthens@littler.com
Jeremy D. Sosna (*pro hac vice pending*)
jsosna@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR PLAINTIFFS**

| **Proof of Service** |
| --- |
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on October 24, 2023, by:<br><br>☒ Hand Delivered      ☐ United States mail<br>☐ Federal Express      ☐ Other (CM/ECF)<br><br>Signature: */s/  Alenah A. Luthens*   _____ |

25

# Exhibit A

DocuSign Envelope ID: 5C7AAABC-0155-42B7-AD84-048E3E2985EF

## AGREEMENT ANCILLARY TO EMPLOYMENT

This AGREEMENT is made effective as of ___July 18, 2016___, 2016, by and between HK FINANCIAL SERVICES, INC ("Employer") and ___MICHAEL CARIGNAN___ ("Employee").

Recitals

A.  Employer is in the business of providing the following services: bookkeeping, public accounting, income tax preparation, data processing including payroll and payroll related services, financial planning, computer consulting, human resources consulting, and business consulting (hereinafter referred to as "Employer's Business"); and

B.  At the time of execution and delivery of this Agreement, Employee has previously accepted employment with Employer and has also executed an Employment Agreement of even date herewith (the "Employment Agreement"); and

C.  Any continued employment of Employee will:
    1)  require the expenditure of time and money by Employer in the training and preparation of Employee; and
    2)  entail the divulging to Employee of various secrets and information as to the confidential methods and procedures of Employer relating to bookkeeping, accounting, income tax preparation, and data processing and the application thereof to specific clients of Employer; and
    3)  bring Employee into personal contact with certain of Employer's clients; and

D.  Employer and Employee recognize that the aforesaid training and preparation, divulging of confidential information, application of confidential methods and procedures, and client contacts are matters of value which could be misused by Employee either during or after Employee's term of employment, and each desires that Employer be protected from such misuse; and

E.  Employer and Employee have agreed upon the terms and conditions contained in this Agreement to protect Employer from potential misuse of confidential information as described above; and

F.  Employer would not have continued to employ Employee (for an undetermined period of time) but for Employee's covenants and undertakings contained herein.

Agreement

In consideration of the foregoing premises, mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.  <u>Non-disclosure of Information</u>. Employee covenants and agrees that he/she will not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to him/her as a result of his/her employment either before or after the date hereof by Employer. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to Employer, including, but not be limited to, information relating to such matters as Employer's trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of Employer, pricing practices for Employer's services, marketing and sales practices of Employer, financial information relative to Employer, any other information which could prove beneficial in enabling a competitor to compete with Employer, and all other information related to Employer's Business.

Employee agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to Employer's operations and business, whether prepared by Employee or not, and all objects associated therewith, including, but not limited to,

Case 2:24-cv-01002-MAR   Document 1-2   Filed 01/11/24   Page 28 of 130

access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by Employer, are the sole and exclusive property of Employer. Employee shall not, except for Employer use, copy or duplicate any of the aforementioned items, nor remove them from the Employer's facilities, nor use any information concerning them, except for Employer's benefit, either during the term of this Agreement or thereafter. Employee expressly agrees to deliver all of the aforementioned items in his/her possession to Employer on termination of this Agreement, or at any other time on Employer's request, together with Employee's written certification of compliance.

2. <u>Anti-Piracy Covenants</u>.    Employee acknowledges that the services he/she is to render pursuant to this Agreement are of a special character with a unique value to Employer, the loss of which cannot adequately be compensated by damages in an action at law.  In view of the unique value to Employer of the services of Employee for which Employer has contracted hereunder and because of the confidential information to be obtained by or disclosed to Employee, Employee covenants and agrees as follows:

    a) Notwithstanding and in addition to the above, during Employee's employment and for a period of two years after he/she ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer, any client, account or location of Employer with which Employee has had any contact as a result of his/her employment either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to his/her employment with Employer.

    b) During Employee's employment and for a period of two years after he/she ceases to be employed by Employer (for any reason whatsoever), Employee shall not, directly or indirectly, solicit for employment or employ any employee of Employer, nor shall Employee, directly or indirectly, offer employment or assist any third party in offering employment (whether as an employee or contractor) to an employee of Employer, without the prior written consent of Employer.  For purposes of this paragraph 2(b), an "employee of Employer" shall be any employee of Employer as of the date Employee ceases to be employed by Employer or any such employee of Employer who was employed by Employer during the one-year period prior to Employee's termination of employment with Employer.

3. <u>Liquidated Damages.</u> Employee agrees that violation of any of the covenants or agreements contained in paragraphs 1 or 2 hereof shall cause damage to Employer, which damage may be difficult to subsequently demonstrate. Consequently, the parties acknowledge and agree that for each breach of this Agreement that results in the loss of one or more of Employer's clients, Employee shall pay liquidated damages, for each and every client lost by Employee's breach of this Agreement, in an amount equal to the regularly occurring annual fee that would have been earned by such lost client (based upon the most recent annual fee for recurring services charged to such client).  Additionally, the parties hereto agree and acknowledge that for each breach of paragraph 2(b) herein, Employee shall pay to Employer liquidated damages equal to fifty percent (50%) of the annual compensation paid to such employee during the during the twelve (12) month period immediately preceding such employee's termination of employment with Employer, or the twelve (12) month period immediately preceding such solicitation of employee, as the case may be.  Employee acknowledges that such liquidated damages are fair and reasonable in light of the anticipated or actual loss that would be caused by a breach of this Agreement. The remedies provided for in this paragraph 3 shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Employer is or may be entitled at law or in equity or under this Agreement.

4. <u>Reasonableness of Restrictions</u>. Employee has carefully read and considered the provisions of paragraphs 1, 2 and 3 and agrees that the restrictions set forth in such paragraphs are fair and reasonable and are reasonably required for the protection of the interests of Employer.

5. <u>Injunctive Relief</u>. It is agreed that violation by Employee of any of the provisions hereof shall cause immediate and irreparable injury to Employer which will authorize immediate recourse to legal or equitable remedy of injunction, including temporary injunction, or specific performance or both, as well as to all other remedies to which Employer may be entitled.

6. <u>Reformation by Court</u>. If Employer, its successors or assigns, shall bring an action for the enforcement of any or all provisions of this Agreement, and if the court shall find on the basis of evidence introduced in said action that this Agreement is unreasonable, then the court shall make a finding as to what is reasonable and enforce this Agreement by judgment or decree to the extent of such findings.

7. <u>Benefit</u>. This Agreement shall inure to the benefit of the successors and assigns of Employer, including any partnership or corporate entity succeeding to Employer's Business by reason of contractual commitments or legal transfer of Employer's Business now or hereafter effected.

8. <u>At-Will Employment</u>. Nothing in this Agreement constitutes any guarantee of continued employment, express or implied. Employee agrees that he/she has no reason or basis for any expectations of ongoing or indefinite employment by Employer or employment for a specific term, and each party hereby acknowledges that Employee's employment is strictly at-will, subject to termination by either party at any time, for any reason or for no reason.

9. <u>Miscellaneous</u>. This Agreement shall be binding upon Employee and his/her heirs, personal representatives, successors and assigns. Any termination of Employee's employment or this Agreement will not terminate or otherwise affect the enforceability of the obligations of the Employee hereunder. The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa. The invalidity or unenforceability of any one or more of the provisions of this Agreement shall not affect the validity and enforceability of the other provisions. This Agreement supersedes all prior discussions and agreements between Employer and Employee with respect to the subject matter hereof. This Agreement cannot be changed or modified or any performance or condition waived, in whole or in part, except by a writing signed by the party against whom enforcement of the change, modification or waiver is sought. The waiver of any breach of any term or condition of this Agreement shall not be deemed to constitute the waiver of any other breach of the same or any other term or condition.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first above written.

HK FINANCIAL SERVICES, INC
Employer

By _____

John R. Darrah, Chief Executive Officer

_____    July 18, 2016

Employee                                                    Date

# Exhibit B

DocuSign Envelope ID: B70CAA4F-ABAE-4EC8-8CC4-A84C68AC47AB

 

## EMPLOYEE PROPRIETARY INFORMATION AGREEMENT

In consideration and as a condition of employment, or continuing employment, by Honkamp Krueger & Co., P.C. and HK Financial Services, Inc. and/or by companies which it owns, controls, or is affiliated with, or their successors in business (the "Company"), and the compensation paid therefore:

1. <u>Confidentiality</u>
   I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose, or make any use of except from the benefit of the Company, at any time either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, processes, know-how, designs, customer lists, business plans, marketing plans and strategies, and pricing strategies, or any subject matter pertaining to any business of the Company or any of its clients, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.

   I agree to take all reasonable good faith efforts to only access information of Company that is relevant to the performance of my employment responsibilities with Company, and which information has a specific business purpose related to my employment with Company, unless I have otherwise been granted specific authorization by the Company to access any such information. In the event I access information of Company to which I am unauthorized to access, I agree that I shall immediately in writing contact my department manager or partner to report such unauthorized access.

2. <u>Conflicting Employment; Return of Confidential Material</u>
   I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge, or data of the Company which I may produce or obtain during the course of my employment.

3. <u>Maintenance of Records</u>
   I agree to keep and maintain adequate and current written records of all sales and customer transactions, which records shall be available to and remain the sole property of the Company at all times.

*Updated May 2019*

4.  <u>Modification</u>
    This agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by the employee and the Company.  I agree that any subsequent change or changes in my duties, salary or compensation shall not effect the validity or scope of this agreement.

5.  <u>Entire Agreement</u>
    I acknowledge receipt of this agreement, and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representation, understandings, or agreements with the Company or any officer or representative thereof.

    Notwithstanding any provision herein to the contrary, I agree and acknowledge that any separate agreement ancillary to employment to which I am a party will also be binding and continue in full force and effect. I agree and acknowledge that this Agreement replaces and supersedes any prior Employee Proprietary Information Agreement to which I may be a party.

6.  <u>Severability</u>
    In the event that any paragraph or provision of this agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from this agreement and the entire agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

7.  <u>Successors and Assigns</u>
    This agreement shall be binding upon my heirs, executors, administrators, or other legal representatives and is for the benefit of the Company, its successors and assigns.

8.  <u>Governing Law</u>
    This agreement shall be governed by the laws of the State of Iowa.

9.  <u>Counterparts</u>
    This agreement shall be signed in two counterparts, each of which shall be deemed an original and both of which shall together constitute one agreement.

Dated: June 20, 2019
_____

Accepted and Agreed By:

MICHAEL CARIGNAN
_____
Employee Name (Print)

DocuSigned by:
MICHAEL CARIGNAN
5AE39750FB69BAB...
_____
Employee Signature



## Certificate Of Completion

Envelope Id: B70CAA4FABAE4EC88CC4A84C68AC47AB
Subject: Please DocuSign: employee proprietary agreement
FlowID: HRProprietary
SalesforceID:
Source Envelope:
Document Pages: 2
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-06:00) Central Time (US & Canada)

Signatures: 1
Initials: 0

Status: Completed

Envelope Originator:
Teri Pitzen
2345 John F Kennedy Rd
Dubuque , IA  52002
tpitzen@honkamp.com
IP Address: 65.125.111.3

## Record Tracking

Status: Original
  6/14/2019 11:56:59 AM

Holder: Teri Pitzen
  tpitzen@honkamp.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| MICHAEL CARIGNAN<br>mcarignan@hkfs.com<br>Security Level: Email, Account Authentication (None) | MICHAEL CARIGNAN<br>5AE59750FB694AB...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 70.130.117.255 | Sent: 6/14/2019 11:57:00 AM<br>Viewed: 6/20/2019 1:02:59 PM<br>Signed: 6/20/2019 1:04:28 PM |

**Electronic Record and Signature Disclosure:**
  Accepted: 6/20/2019 1:02:59 PM
  ID: ab5b4730-bb6f-46b1-8e34-baebd05c22bb

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/14/2019 11:57:00 AM |
| Certified Delivered | Security Checked | 6/20/2019 1:02:59 PM |
| Signing Complete | Security Checked | 6/20/2019 1:04:28 PM |
| Completed | Security Checked | 6/20/2019 1:04:28 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**
From time to time, Honkamp Krueger & Co., P.C. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**
At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we have sent to you through your DocuSign user account for a limited period of time (usually approximately 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**
If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**
If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**
Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Honkamp Krueger & Co., P.C.:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: info@honkamp.com


**To advise Honkamp Krueger & Co., P.C. of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at info@honkamp.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Honkamp Krueger & Co., P.C.**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to info@honkamp.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Honkamp Krueger & Co., P.C.**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to info@honkamp.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000 or WindowsXP |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0 or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change at the sole discretion of HK. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software

requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Honkamp Krueger & Co., P.C. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Honkamp Krueger & Co., P.C. during the course of my relationship with you; and

- I shall not hold HK liable for any direct or indirect damages incurred, including, without limitation, any special, incidental or consequential damages, or any other damages, including damages for loss of profits or business interruption, arising out of or related to any malfunction of the Docusign software outside the control of HK, or otherwise resulting from my failure to diligently check my email or to print off paper copies as may be necessary for my use.

# Exhibit C

September 29, 2023

**VIA EMAIL & CERTIFIED MAIL**

Aaron Maxey
Director, Financial Planning Consultant
Avantax
3200 Olympus Blvd., Suite 100
Dallas, TX 75019

RE:      Resignation

Dear Aaron:

I hereby terminate my employment and association with Avantax Wealth Management, Avantax Advisory Services, and Avantax Investment Services, (collectively "Avantax"), effective immediately.

It is my intention to affiliate with Mariner, LLC dba Mariner Wealth Advisors. In this regard, my contact information will be:

400 Northridge, Suite 425
Atlanta, GA 30350
Tel.: (470) 462-2708
Email: mike.carignan@marinerwealthadvisors.com

I am providing my contact information, consistent with FINRA Regulatory Notice 19-10, issued on April 5, 2019, so that Avantax may instruct its representatives to provide this information in response to client questions concerning my departure from the firm.

Although I do not anticipate any difficulties, if there are any legal matters that require my attention, you are directed to contact my attorney directly using the following information:

Katie M. Connolly, Esq.
Nilan Johnson Lewis, P.A.
kconnolly@nilanjohnson.com
Tel.: (612) 305-7546

Upon filing a Form U5 evidencing my voluntary termination, please forward a copy to my address listed above.

Finally, I will await instructions for the return of my Avantax laptop or other equipment currently in my possession. Please note that I have taken measures to remove information Avantax could reasonably consider its confidential information from my personal devices, including retaining a third party forensics expert to assist.

Yours truly,

Michael Carignan

# Exhibit D



Littler Mendelson, PC
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136

Jeremy D. Sosna
612.313.7606 direct
612.630.1000 main
612.677.3106 fax
jsosna@littler.com

October 20, 2023

**VIA E-MAIL ONLY**

Mr. Marty Bicknell
Mariner Wealth Advisors, LLC
5700 W. 112th Street, Ste. 200
Overland Park, KS 66211

*Re:* *Employment Agreements of Michael Carignan - <u>CEASE AND DESIST</u>*

Dear Mr. Bicknell:

We represent Avantax Planning Partners, Inc. ("Avantax") and Avantax, Inc. with regard to Mike Carignan's ongoing violations of certain agreements he has with Avantax, including his Agreement Ancillary to Employment (the "Ancillary Agreement") and the Employee Proprietary Information Agreement (the "Proprietary Information Agreement") (collectively referred to herein as the "Agreements"). It has come to our attention that Mr. Carignan recently left employment with Avantax and has engaged in an ongoing pattern of breaches of the Agreements by, among other things, soliciting Avantax clients on behalf of Mariner, LLC, d/b/a/ Mariner Wealth Advisors ("Mariner") and interfering with Avantax's agreements and business expectancies with its business partners, all while using Avantax trade secrets and other confidential and proprietary information. As set forth below, we are writing to you to: (1) place Mariner on notice of Mr. Carignan's continuing obligations to Avantax under the Agreements and law; and (2) demand that Mariner immediately **cease and desist** its interference with Mr. Carignan's legal and contractual obligations owed to Avantax. Please be advised that Avantax takes this matter very seriously and will not tolerate either Mr. Carignan's violations of his obligations to Avantax under the Agreements or Mariner's further interference with Avantax's rights pursuant to the Agreements.

It is our understanding that Mariner has received and is already fully aware of the Agreements and Mr. Carignan's obligations thereunder. Nonetheless, I direct your attention to Sections 1, 2, and 3 of the Ancillary Agreement and Sections 1 and 2 of the Proprietary Information Agreement. The Agreements generally prohibit Mr. Carignan from (a) using or disclosing Avantax's Confidential Information (as defined in the Agreements) for the benefit of any third-party and (b) directly or indirectly soliciting, assisting in the solicitation of, or accepting the business of, any Avantax client or prospective client following the termination of his employment.

The restrictive covenants contained in the Agreements are reasonable, valid and enforceable under Iowa law (which governs the Agreements). Iowa courts routinely uphold such reasonable non-solicitation

agreements and are authorized to enter, and regularly do enter, injunctions to prevent violations of such restrictive covenants, as well as to prevent the intentional and tortious interference with such contractual obligations by a third-party such as Mariner. Moreover, Iowa courts are authorized to grant other relief (including monetary relief) to remedy the tortious interference with a party's rights under a contract by a third-party. It was and is Avantax's full expectation that Mr. Carignan would strictly comply with each and every provision in the Agreements, including the above-referenced restrictions on Mr. Carignan's post-employment activities — covenants to which Mr. Carignan voluntarily agreed in exchange for his continued employment relationship with Avantax, access to Avantax's trade secrets and other confidential and proprietary information, and the valuable compensation and benefits he enjoyed as a result of that employment.

We are now aware that Mr. Carignan has not lived up to his promises to Avantax and that Mariner has knowingly procured Mr. Carignan's breach of the Agreements by permitting him to solicit and accept business with Avantax's clients and prospective clients. Avantax has learned that Mr. Carignan has commenced employment with Mariner and has actively solicited numerous Avantax clients to end their relationship with Avantax and move the clients' business to Mariner, with Mariner's apparent full knowledge that Mr. Carignan's activities are in violation of the Agreements and his other legal obligations. It cannot seriously be disputed that Mr. Carignan's actions are in direct breach of his obligations to Avantax pursuant to the Agreements. Avantax is very confident that the evidence of Mr. Carignan's violations, including his unlawful solicitation of Avantax clients, will be overwhelming and that Avantax will prevail in proving breaches of the Agreements by Mr. Carignan.

Avantax further has information and believes that Mariner had full knowledge of Mr. Carignan's legal obligations to Avantax pursuant to the Agreements when it hired Mr. Carignan and allowed him to solicit Avantax customers on Mariner's behalf using Avantax's trade secrets and confidential information, all in violation of the Agreements. Mariner has not only knowingly tolerated these breaches of the Agreement by Mr. Carignan, but Avantax has information showing that Mariner has actively supported Mr. Carignan's breaches and efforts to steal Avantax's clients without any legal justification whatsoever, including by having members of Mariner's client acquisition team contact Avantax clients and business partners on Mr. Carignan's behalf. Under Iowa law, Mariner can be held liable for intentionally interfering with the contract between Mr. Carignan and Avantax based upon Mariner's knowledge and procurement of Mr. Carignan's breaches of the valid and enforceable Agreements without any valid justification, as well as based on Mariner's misappropriation of Avantax's trade secrets.

**This matter demands Mariner's immediate attention**. Avantax takes Mr. Carignan's violations of the Agreements very seriously and will not tolerate any further breach of Mr. Carignan's obligations owed to Avantax **or** Mariner's continued interference with those obligations under the Agreements. While Avantax hopes to avoid a legal dispute with Mariner, Avantax has suffered and continues to suffer irreparable harm due to, among other things, the loss of its goodwill and customer relationships that Avantax paid Mr. Carignan handsomely to cultivate on its behalf. Moreover, the irreparable harm and financial losses to Avantax as a result of Mr. Carignan's breaches of the Agreements will continue in the future unless Mariner ceases in procuring Mr. Carignan's breach of the Agreements – Avantax will lose the opportunity to continue relationships with clients in the future and enjoy the financial benefits (of unknown quantity)

generated by the goodwill and client relationships that, but for Mariner's procurement of Mr. Carignan's unlawful conduct, Avantax could reasonably have been expected to continue indefinitely.

Accordingly, Avantax demands that Mariner **immediately cease and desist** with its interference with the Agreements between Avantax and Mr. Carignan. This letter constitutes Avantax's only and final effort to secure Mariner's compliance with its legal obligation to not interfere with Avantax's rights under the Agreements. Avantax welcomes a satisfactory response from Mariner by **close of business on October 25, 2023**. Notwithstanding, Avantax retains the right to consider all available legal remedies against Mariner to enforce its rights to the maximum extent permitted by law.

We trust that Mariner understands the importance of this matter and thank you in advance for your cooperation. We look forward to your prompt response.

Sincerely,

*/s/ Jeremy D. Sosna*

Jeremy D. Sosna
Shareholder

cc:     Ms. Tabitha Bailey
        Ms. Jennifer Wang
        Mr. Louie Rosalez
        Ms. Katie Connolly

4861-5602-1636.2 / 109298-1001

# Exhibit E



**Littler Mendelson, PC**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136

Jeremy D. Sosna
612.313.7606 direct
612.630.1000 main
612.677.3106 fax
jsosna@littler.com

October 20, 2023

**VIA E-MAIL ONLY**

Ms. Katie Connolly
Nilan Johnson Lewis PA
250 Marquette Ave. S, Ste. 800
Minneapolis, MN 55401
kconnolly@nilanjohnson.com

*Re:    **Employment Agreements of Michael Carignan - <u>CEASE AND DESIST</u>***

Dear Ms. Connolly:

We represent Avantax Planning Partners, Inc. ("Avantax") and Avantax, Inc. with regard to Michael Carignan's ongoing violations of his Agreement Ancillary to Employment (the "Ancillary Agreement") and Employee Proprietary Information Agreement (the "Proprietary Information Agreement") (collectively referred to herein as the "Agreements") with Avantax. It has come to our attention that Mr. Carignan is in breach of these Agreements by, among other things, soliciting Avantax clients on behalf of Mariner, LLC, d/b/a/ Mariner Wealth Advisors ("Mariner"), interfering with Avantax's contracts and business expectancies with its clients and business partners, and misappropriating Avantax's trade secrets and other confidential and proprietary information. As set forth below, we are writing to you as counsel for Mr. Carignan to (1) place Mr. Carignan on notice of his continuing obligations to Avantax under the Agreements; and (2) demand that Mr. Carignan immediately **cease and desist** with further breaches of his legal and contractual obligations owed to Avantax. Please be advised that Avantax takes this matter very seriously and will not tolerate either Mr. Carignan's violations of his obligations to Avantax under the Agreements or Mariner's further interference with Avantax's rights pursuant to the Agreements.

We direct your attention to Sections 1, 2, and 3 of the Ancillary Agreement and Sections 1 and 2 of the Proprietary Information Agreement. Among other things, the Agreements prohibit Mr. Carignan from (a) using or disclosing Avantax's Confidential Information (as defined in the Agreements) for the benefit of any third-party and (b) directly or indirectly soliciting, assisting in the solicitation of, or accepting the business of any Avantax client or prospective client following the termination of his employment (including CPAs with which he had contact or about which he learned confidential information while employed).

The restrictive covenants contained in the Agreements are reasonable, valid, and enforceable under Iowa law (which governs the Agreements). Iowa courts routinely uphold such reasonable restrictive covenants and are authorized to enter, and regularly do enter, injunctions to prevent violations of such restrictive

covenants, as well as to prevent the intentional and tortious interference with such contractual obligations by a third-party such as Mariner. It was and is Avantax's full expectation that Mr. Carignan will strictly comply with each and every provision in the Agreements, including the above-referenced restrictions on Mr. Carignan's post-employment activities —covenants to which Mr. Carignan voluntarily agreed in exchange for continued employment relationship with Avantax, access to Avantax's trade secrets and other confidential and proprietary information, training, and the valuable compensation and benefits he enjoyed as a result of that employment.

We are now aware that Mr. Carignan has not lived up to his promises to Avantax. Avantax has learned that Mr. Carignan has commenced employment with Mariner and has actively solicited Avantax clients to end their relationship with Avantax and move the clients' business to Mariner, with Mariner's apparent full knowledge that Mr. Carignan's activities are in violation of the Agreements. It cannot seriously be disputed that Mr. Carignan's actions are in direct breach of his obligations to Avantax pursuant to the Agreements. Avantax is very confident that the evidence of Mr. Carignan's violations, including his unlawful solicitation of Avantax clients, will be overwhelming and that Avantax will prevail in proving breaches of the Agreements by Mr. Carignan. To be clear, Avantax cannot and will not tolerate any further breaches by Mr. Carignan of his legal obligations to Avantax and is prepared to bring legal action against Mr. Carignan and Mariner to vindicate its legal rights. Of course, if our information regarding Mr. Carignan's solicitation of Avantax clients on Mariner's behalf is incorrect, we request that you advise us accordingly so that we may further evaluate Mr. Carignan's compliance with the Agreements.

Avantax also maintains trade secrets that Mr. Carignan is legally prohibited from disclosing to any person without Avantax's consent, either during or subsequent to employment. State and federal laws protect Avantax's trade secrets and other confidential information from such misappropriation and improper disclosure. Both the Iowa Uniformed Trade Secrets Act and the federal Defend Trade Secrets Act protect against actual or threatened disclosure of trade secrets and provide Avantax the right to obtain both injunctive relief and damages. The trade secrets and other confidential and proprietary information owned and maintained by Avantax are critical to and a significant source of the Company's competitive advantage in the marketplace. Such trade secrets include highly sensitive information that Mr. Carignan was provided or to which he was given access during his employment, including without limitation information regarding the Company's business and strategy, research and development, marketing techniques, products and services, analytical tools, pricing and margins, and clients (which include CPA firms with which Avantax has relationships), among other things. If such trade secrets were disclosed to a competitor or any other third-party, it would destroy the competitive advantage enjoyed by Avantax and that results from the secrecy of this information. We trust that Mr. Carignan fully understands his obligations and will immediately cease his use, reliance on, and disclosure of any of Avantax's trade secrets and other confidential and proprietary information.

**This matter demands Mariner's immediate attention**. Avantax takes Mr. Carignan's violations of the Agreement very seriously and will not tolerate any further breach of Mr. Carignan's obligations owed to Avantax (or Mariner's continued interference with those obligations under the Agreements). While Avantax hopes to avoid a legal dispute with Mariner, Avantax has suffered and continues to suffer irreparable harm due to, among other things, the loss of its goodwill and customer relationships that

Avantax paid Mr. Carignan handsomely to cultivate on its behalf. Moreover, the irreparable harm and financial losses to Avantax as a result of Mr. Carignan's breaches of the Agreement will continue into the future unless Mr. Carignan immediately ceases in his breaches of the Agreement – Avantax will lose the opportunity to continue relationships with clients in the future and enjoy the financial benefits (of unknown quantity) generated by the goodwill and client relationships that, but for Mr. Carignan's unlawful conduct, Avantax could reasonably have been expected to continue indefinitely.

Accordingly, Avantax demands that Mr. Carignan **immediately cease and desist** with his interference with the Agreements with Avantax. This letter constitutes Avantax's final effort to secure Mr. Carignan's compliance with his legal obligation to Avantax under the Agreements. Avantax welcomes a satisfactory response from Mr. Carignan by **close of business on October 25, 2023**. Notwithstanding, Avantax retains the right to consider all available legal remedies against Mr. Carignan and Mariner to enforce its rights to the maximum extent permitted by law.

In addition, this letter constitutes notice to Mr. Carignan and Mariner to preserve documents and information relevant to Avantax's claims. Avantax specifically demands that **Mr. Carignan and Mariner preserve, and not alter, delete, or destroy** (and that Mariner ensures that each of its affiliates, employees, representatives, agents, and anyone acting with Mariner preserves, and does not alter, delete or destroy) **any and all documents or electronically-stored information[1] in your or its possession, custody, or control concerning, relating to, or involving any of the following**:

---

[1] The term "documents" and "electronically-stored information" shall be construed to have the broadest meaning possible, and shall include all written, electronic, typewritten, handwritten, recorded, or printed matter or material of any kind, including the originals and all identical and/or non-identical copies thereof, including any non-identical copies different from the originals by reason of any notation made on such copies or otherwise, including without limitation, minutes and/or other records of meetings, agendas, bills, contracts, leases, assignments, agreements, summaries of negotiation, account books, orders, invoices, statements, checks, accounting records, summaries, diaries, forecasts, studies, charts, reports, and/or summaries of investigations or reports, press releases, statements of policy, correspondence, letters, interoffice and intra-office communications, offers, notations of any sort of conversations, appointment books, day planners, calendars or other appointment or activity schedule, faxes, confirmations, computer files, cloud computing data (including, but not limited to iCloud, iTunes, Google Drive, DropBox, and Hightail); printouts of computer files, computer data, emails, text messages, instant messages, chats, MMS messages, SMS messages, Skype messages, social media postings or messages, all graphic or manual records or representations of any kind, including without limitation, photographs, microfiche, microfilm, video tape, records, motion pictures, and electronic, mechanical or electric records or representations of any kind, including tapes, cassettes, disks, magnetic cards, and recordings; all drafts, alternations, modifications, changes and amendments of any of the foregoing; and all other similar material which is in the possession, custody, or control of you, Mariner, or Mariner's employees, agents, or representatives. Without limiting the term "control" as used in the preceding sentence, a document or ESI shall be deemed to be within the control of Mr. Carignan or Mariner, regardless of physical location, if such entity or individual has the right to secure the document or ESI from another person or entity, either public or private, including, but limited to, such person or entity's legal counsel, having possession thereof. Please ensure that all of your and Mariner's agents and representatives have taken all steps necessary to comply with these obligations.

1. Communications between Mr. Carignan and Mariner, or anyone on Mariner's behalf, at any time;

2. Communications between Mr. Carignan and any client of Avantax or Mariner (including any CPA firms with whom Avantax had a relationship during Mr. Carignan's employment);

3. Communications between Mr. Carignan and any other current or former Avantax employee;

4. Interviews, meetings, or calls with any current or former Avantax employee, including Mr. Carignan, at any time;

5. Documents relating to or referencing any current or former Avantax employee;

6. Documents regarding the Mr. Carignan's or any other current or former Avantax employee's potential, prospective, or actual employment with Mariner, including without limitation all Documents relating to the solicitation, recruitment, or hiring of any current or former Avantax employee;

7. Any documents, electronic equipment, devices, digital media storage devices, or drives provided by Mr. Carignan or any current or former Avantax employee to Mariner, or anyone on Mariner's behalf;

8. Documents relating to or referencing Avantax's business;

9. Documents relating to or referencing Avantax's employees or clients (including without limitation any CPA firm with which Avantax had any relationship or prospective relationship during Mr. Carignan's employment);

10. Avantax's confidential, proprietary, and trade secret information, including, but not limited to, any Avantax employee or client information (including without limitation any CPA firm with which Avantax had any relationship or prospective relationship during Mr. Carignan's employment); and

11. Mr. Carignan's or any current or former Avantax employee's activities on behalf of Mariner.

Please confirm in writing by no later than close of business on <u>October 25, 2023</u>, that Mr. Carignan and Mariner have taken all steps necessary to preserve such documents and electronically-stored information.

We trust that Mr. Carignan understands the importance of this matter and will govern himself accordingly. We look forward to your prompt response.

Sincerely,

*/s/ Jeremy D. Sosna*

Jeremy D. Sosna
Shareholder

JDS/rnl

cc:    Ms. Tabitha Bailey
        Ms. Jennifer Wang
        Mr. Louie Rosalez
        Mr. Marty Bicknell

4885-9114-9188.2 / 109298-1000

# Exhibit F



Senior Wealth Advisor

  mike.carignan@mariner wealthadvisors.com

📞 470-462-2708

# Designations and Licenses

Mike is a CERTIFIED FINANCIAL PLANNER™ professional and holds life, health and variable annuity insurance licenses.

# Experience and Education

Mike serves as a trusted partner to clients, helping them create a plan to reach their financial goals today, tomorrow and in the future. In addition, he specializes in working with a client's CPA to provide wealth planning and investment strategies that integrate estate planning, risk management and retirement planning into a customized wealth plan.

Prior to joining Mariner Wealth Advisors, Mike was a financial planning consultant at Avantax Planning Partners and HK Financial Services.

Mike has a bachelor's degree in biology from The Citadel – The Military College of South Carolina.

# Personal Interests

Away from the office, Mike enjoys attending his boys' athletic events, golfing, camping and spending time with family. Additionally, because he has two sons in the U.S. Army, he supports a variety of military-centered charities.

## Mike's Office

400 Northridge Rd.
Suite 425
Atlanta, GA 30350

**470-575-0221**

Case 2:24-cv-01002-MAR   Document 1-2   Filed 01/11/24   Page 52 of 130

# IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

| | |
|---|---|
| Avantax Planning Partners, Inc.; and<br>Avantax, Inc. | **Court File No.** |
| Plaintiffs, | **PLAINTIFFS' APPLICATION FOR A<br>TEMPORARY INJUNCTION** |
| vs. | |
| Michael Carignan; and Mariner, LLC, d/b/a<br>Mariner Wealth Advisors. | |
| Defendants. | |

COME NOW, Plaintiffs, Avantax Planning Partners, Inc. ("Avantax")[1] and Avantax, Inc. (collectively "Plaintiffs"), and pursuant to Iowa Rule of Civil Procedure 1.501, et seq., applies to this Court for a Temporary Injunction against Defendants Mariner, LLC, d/b/a Mariner Wealth Advisors ("Mariner") and Michael Carignan ("Carignan"), and in support thereof states as follows:

1.    Defendant Mariner, LLC, d/b/a Mariner Wealth Advisors ("Mariner") is a Kansas limited liability company with a principal place of business in Overland Park, Kansas, and transacts business in the State of Iowa.

2.    Defendant Michael Carignan ("Carignan") is a citizen and resident of Georgia. Carignan was employed by Avantax from May 20, 2013, to September 29, 2023.

3.    Carignan commenced employment with Avantax on May 20, 2013. Carignan served as a Senior Financial Advisor and later as a Financial Planning Consultant.

4.    Carignan served Avantax's clients primarily by providing financial planning, securities transactions, insurance, and related wealth management services.

---

[1] Defendant Michael Carignan was an employee serving primarily Plaintiff Avantax Planning Partners, Inc. References to "Avantax" throughout this Application are to Plaintiff Avantax Planning Partners, Inc. or "APP," unless otherwise specified.

5.      During his employment, Carignan became intimately familiar with proprietary and confidential information of Avantax regarding its clients—including both Avantax's end-user and CPA firm clients.

6.      Carignan regularly provided services to the clients of Avantax, which required him to, among other things, obtain, collect, and utilize the confidential information of Avantax and the clients of Avantax which he serviced.

7.      Because of the work Carignan performed for Avantax, and because of the sensitivity of the information to which he had access, Avantax required that he agree to certain confidentiality and non-solicitation provisions.

8.      On July 18, 2016, Carignan signed the Agreement Ancillary to Employment ("Agreement Ancillary").  Carignan promised in the Agreement Ancillary to certain restrictions on his use, disclosure, or retention of Avantax's confidential information, as well as restrictions on his solicitation of Avantax clients or employees upon the termination of his employment relationship with Avantax.

9.      Section 1 of the Agreement Ancillary provides as follows:

> 1. <u>Non-disclosure of Information</u>. Employee covenants and agrees that he/she will not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to him/her as a result of his/her employment either before or after the date hereof by Employer. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to Employer, including, but not be limited to, information relating to such matters as Employer's trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of Employer, pricing practices for Employer's services, marketing and sales practices of Employer, financial information relative to Employer, any other information which could prove beneficial in enabling a competitor to compete with Employer, and all other information related to Employer's Business.

2

Employee agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to Employer's operations and business, whether prepared by Employee or not, and all objects associated therewith, including, but not limited to, access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by Employer, are the sole and exclusive property of Employer. Employee shall not, except for Employer use, copy or duplicate any of the aforementioned items, nor remove them from the Employer's facilities, nor use any information concerning them, except for Employer's benefit, either during the term of this Agreement or thereafter. Employee expressly agrees to deliver all of the aforementioned items in his/her possession to Employer on termination of this Agreement, or at any other time on Employer's request, together with Employee's written certification of compliance.

10. Section 2 of the Agreement Ancillary states:

2. <u>Anti-Piracy Covenants</u>. Employee acknowledges that the services he/she is to render pursuant to this Agreement are of a special character with a unique value to Employer, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Employer of the services of Employee for which Employer has contracted hereunder and because of the confidential information to be obtained by or disclosed to Employee, Employee covenants and agrees as follows:

a) Notwithstanding and in addition to the above, during Employee's employment and for a period of two years after he/she ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer, any client, account or location of Employer with which Employee has had any contact as a result of his/her employment either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to his/her employment with Employer.

b) During Employee's employment and for a period of two years after he/she ceases to be employed by Employer (for

3

any reason whatsoever), Employee shall not, directly or indirectly, solicit for employment or employ any employee of Employer, nor shall Employee, directly or indirectly, offer employment or assist any third party in offering employment (whether as an employee or contractor) to an employee of Employer, without the prior written consent of Employer. For purposes of this paragraph 2(b), an "employee of Employer" shall be any employee of Employer as of the date Employee ceases to be employed by Employer or any such employee of Employer who was employed by Employer during the one-year period prior to Employee's termination of employment with Employer.

11. Section 5 of the Agreement Ancillary states:

It is agreed that violation by Employee of any of the provisions hereof shall cause immediate and irreparable injury to Employer which will authorize immediate recourse to legal or equitable remedy of injunction, including temporary injunction, or specific performance or both, as well as to all other remedies to which Employer may be entitled.

12. On June 20, 2019, Carignan further agreed to protect Avantax's confidential information by signing an Employee Proprietary Information Agreement ("Proprietary Agreement").

The Proprietary Agreement states in relevant part:

2. Conflicting Employment; Return of Confidential Material

I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge, or data of the Company which I may produce or obtain during the course of my employment.

4

13. During Carignan's employment with Avantax, he routinely attended meetings held in Dubuque, Iowa, for the purposes of, among other things, strategic planning and Carrigan had significant and regular contact with employees at the Dubuque office of Avantax by telephone, email, and text. Support services were provided by personnel in the Dubuque office of Avantax to Carignan, including, but not limited to, accounting, marketing, reporting, insurance, retirement planning and financial planning support, human resources, and related services.

14. On Friday, September 29, 2023, Carignan abruptly terminated his employment with Avantax by email to Aaron Maxey, Avantax's Director of Financial Planning Consultants and Carignan's manager. Immediately after resigning his employment with Avantax, Carignan commenced employment with Mariner (a direct competitor of Avantax) and began directly and indirectly soliciting Avantax's clients to leave Avantax and move the clients' business to Mariner, all while using Avantax's confidential information to do so.

15. Carignan has breached Paragraph 1 of the Agreement Ancillary by using confidential information of Avantax. (*See* Affidavit of Aaron Maxey).

16. Carignan has breached Paragraph 2 of the Agreement Ancillary by contacting Avantax's clients in an effort to solicit business from Avantax's clients. (*See* Affidavit of Aaron Maxey).

17. Carignan has breached Paragraph 2 of the Proprietary Agreement by retaining, using, and disclosing Avantax's confidential information. (*See* Affidavit of Aaron Maxey).

18. Mariner has intentionally and tortiously interfered with the contracts between Avantax and Carignan by supporting and encouraging Avantax's breach of the Ancillary Agreement.

5

19. The Agreement Ancillary calls for immediate entry of an order for a temporary injunction or specific performance (or both) or other injunctive relief due to Carignan's violation of the same.

20. The actions of Carignan and Mariner warrant the issuance of a temporary injunction enforcing the terms and conditions of the Agreement Ancillary and the Proprietary Agreement.

21. Unless Carignan is restrained and prevented from violating paragraphs 1 and 2 of the Agreement Ancillary and violating the Proprietary Agreement, Avantax will suffer permanent damage to its business and will be greatly and irreparably injured.

22. The precise amount of Avantax's potential damages cannot be definitely determined, but it is substantial. Furthermore, Avantax has no adequate remedies solely at law.

23. No petition for the same relief requested herein (a Temporary Injunction in favor of Avantax and against Carignan and Mariner relating to Carignan's client solicitation on behalf of Mariner) has been previously presented to or refused by any court or justice.

WHEREFORE, Plaintiffs, Avantax Planning Partners, Inc. and Avantax, Inc. respectfully pray that during the pendency of this action the Court issue a Temporary Writ of Injunction, without bond, against Defendants Mariner, LLC, d/b/a Mariner Wealth Advisors and Michael Carignan, enjoining them from:

1) Taking action of any character that results in violation of or interference with the non-solicitation provisions of the Agreement Ancillary, including contacting or soliciting in any way, whether directly or indirectly, any individual, business, customer, or company whose identity or other information was obtained from Avantax's trade secrets or other confidential or proprietary information, including without limitation the CPA firm clients with which Carignan worked during his employment with Avantax, for any competing purpose or any purpose detrimental to Avantax's interests, for the period of time as defined in the Ancillary Agreement;

6

2) Taking any action that results in violation the confidentiality provisions of the Agreement Ancillary or the Proprietary Agreement; and

3) Taking any action that constitutes a use, disclosure, or misappropriation of Avantax's trade secrets.

Respectfully submitted,

Date: October 24, 2023

*/s/ Alenah A. Luthens*
Alenah A. Luthens, AT0015288
aluthens@littler.com
Jeremy D. Sosna (*pro hac vice pending*)
jsosna@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR PLAINTIFFS**

| Proof of Service |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on October 24, 2023, by: |
| ☒ Hand Delivered ☐ United States mail<br>☐ Federal Express ☐ Other (CM/ECF) |
| Signature: */s/ Alenah A. Luthens* |

Firmwide:152908468.1 800000.4444

7

# IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

Avantax Planning Partners, Inc.; and
Avantax, Inc.

                              Plaintiffs,

        vs.

Michael Carignan; and Mariner, LLC, d/b/a
Mariner Wealth Advisors.

                              Defendants.

**Court File No.**

**PLAINTIFFS' MEMORANDUM OF
LAW IN SUPPORT OF THEIR
APPLICATION FOR A TEMPORARY
INJUNCTION**

Plaintiffs, Avantax Planning Partners, Inc. ("Avantax")[1] and Avantax, Inc. (collectively "Plaintiffs"), seek entry of a temporary injunction to prevent Defendants Michael Carignan ("Carignan") and Mariner, LLC, d/b/a Mariner Wealth Advisors ("Mariner") from continuing to violate and interfere with the plain terms of valid and enforceable post-employment confidentiality and non-solicitation restrictions contained in certain employment agreements between Avantax and Carignan.

Avantax will suffer severe, immediate, and irreparable harm without an injunction against Carignan's and Mariner's unfair competition. Carignan signed an Agreement Ancillary to Employment ("Agreement Ancillary") on July 18, 2016, affirming the restrictions on his use, disclosure, or retention of Avantax's confidential information and imposing reasonable and enforceable restrictions on his ability to solicit Avantax's business partners and customers. Thereafter, on June 20, 2019, Carignan signed an Employee Proprietary Information Agreement ("Proprietary Agreement") through which he further agreed to protect Avantax's confidential information. Despite these promises, Carignan abruptly resigned his employment with Avantax

---

[1] Defendant Michael Carignan was an employee serving primarily Plaintiff Avantax Planning Partners, Inc. References to "Avantax" throughout this Memorandum are to Plaintiff Avantax Planning Partners, Inc. or "APP," unless otherwise specified.

on September 29, 2023, without notice, immediately commenced employment with Mariner (an undisputed direct competitor of Avantax), and began using Avantax's confidential information to solicit Avantax's clients, in violation of the plain terms of the Agreement Ancillary and the Proprietary Agreement. Mariner has full knowledge of the restrictions imposed on Carignan as set forth in the Agreement Ancillary and Proprietary Agreement, yet it has continued to act with complete disregard of those valid agreements by employing Carignan and allowing (indeed, encouraging and supporting) him to solicit Avantax's clients.

Immediately after commencing employment for Mariner, Carignan began assailing the very backbone of Avantax's business by soliciting and seeking to convert Avantax's clients to which Avantax had introduced Carignan, about which Avantax provided Carignan confidential information, and for which Avantax handsomely compensated Carignan to cultivate on Avantax's behalf. Carignan did so while using and misappropriating Avantax's trade secrets and highly sensitive confidential information about Avantax's clients that he learned *only* by virtue of his employment with Avantax, including its client fee structure and the fees or commissions paid to its CPA firm clients. There can be little dispute that Carignan is in breach of the Agreement Ancillary and the Proprietary Agreement by virtue of his employment with Mariner, his use of Avantax's confidential information, and the solicitation of its customers. Despite Avantax's demand that Carignan and Mariner cease and desist with their violations of Avantax's legal rights, Carignan continues to act in a manner that is directly contrary to the promises he made in the Agreement Ancillary and the Proprietary Agreement.

Carignan's efforts to destroy the valuable client relationships that are the lifeblood of Avantax's business has caused and will continue to cause Avantax significant, permanent, and irreparable harm. Importantly, Avantax's loss of even one relationship cannot be fully remedied

2

by an award of money damages because of the unknown quantity and value of the prospective client relationships of which Avantax will be deprived by virtue of Carignan and Mariner's unlawful conduct. Unless Carignan and Mariner's unlawful conduct is enjoined, Avantax will suffer immediate and irreparable harm, including the misappropriation of confidential information, loss of significant business relationships, and injury to customer goodwill. It is clear that, absent the Court entering the requested temporary injunction, Carignan and Mariner do not intend to cease their unlawful acts that are causing Avantax irreparable harm. Accordingly, Plaintiffs respectfully request that the Court enter a temporary injunction prohibiting Carignan from breaching and Mariner from interfering with the Agreement Ancillary and the Proprietary Agreement.

## FACTUAL BACKGROUND

### I. AVANTAX'S BUSINESS

Avantax, Inc. is a wealth advisory firm founded in 1983 by a CPA to provide financial planning and wealth management services with a tax-focused lens. (Affidavit of Aaron Maxey, dated October 23 2023 ("Maxey Aff.") ¶ 3.) The firm is a pioneer in the tax-focused financial planning movement and its comprehensive investment services include strategies and solutions in investment, retirement planning, business planning, cash-flow management, family and education planning, and legacy planning. (*Id.*) Avantax operates in a very niche financial services marketplace that identifies and engages its customer base in a unique way that differentiates Avantax from other financial services firms. (Maxey Aff. ¶ 6.) Unlike ordinary financial services firms, which rely on each financial professional to solicit their own customers, APP's business model involves strategically developing focused partnerships and relationships between Avantax and CPA firm clients across the United States to provide comprehensive financial planning and wealth management services to end-user clients. (*Id.*) Avantax considers as clients both the end-

user clients to whom its financial professionals provide wealth management strategies and advice, as well as CPA firm clients with whom its financial professionals collaborate. (Maxey Aff. ¶ 5.)

In this business model, the relationships that Avantax builds with CPA firm clients are a significant and critical source of Avantax's competitive advantage in the marketplace that extends as a benefit to its financial professionals. (Maxey Aff. ¶ 8) Avantax's CPA firm clients have a well-developed client base and, through their relationship with Avantax, are able to provide more comprehensive financial services to end-user clients. (*Id.*) Avantax, in turn, builds upon the trust that CPA firm clients have already established with end-user clients by providing that additional strategic advice and financial planning in collaboration with its CPA firm clients' tax and related planning and advice. (*Id.*) This relationship gives Avantax a distinct competitive edge over other financial services firms that have not developed these business relationships with CPA firm clients—a competitive edge that can quickly and permanently disappear if the relationships between Avantax and its CPA firm clients are damaged. (*Id.*)

Since its founding in 1983, Avantax has grown to its current size precisely because of the client relationships it has built with CPA firms. (Maxey Aff. ¶¶ 3-8.) Avantax professionals work closely with CPA firm clients to provide holistic financial planning and wealth management services by considering each end-user client's financial goals and related tax planning implications. (Maxey Aff. ¶ 7.) Through the relationships that Avantax has cultivated with CPA firm clients, Avantax's financial professionals can focus their time and energy on servicing the end-user clients of CPA firm clients, rather than spending the otherwise substantial time and resources necessary to source and solicit end-user clients directly. (*Id.*)

Avantax invests significant time and resources developing relationships with both CPA firm clients as well as the end-user client base that flows from the relationship between Avantax

4

and CPA firm clients, including by developing and maintaining certain trade secrets and other confidential and proprietary information relating to Avantax's business relationships with CPA firm clients and end-user clients. (Maxey Aff. ¶ 9.) In particular, Avantax prizes its confidential information regarding both its client fee structure and the fees or commissions paid to CPA firm clients. (*Id.*) Knowledge of the compensation is highly confidential and is not known to the general public or, more importantly, Avantax's competitors. (*Id.*) If any of Avantax's competitors were given access to this information, it would put that competitor in an unfair competitive advantage because the competitor would have the information needed to unfairly target CPA firm clients and end-user clients by undercutting the fees/commissions charged by Avantax or paid to CPA firm clients. (Maxey Aff. ¶ 10.) Without such knowledge, Avantax's competitors have struggled to effectively compete for the valuable relationships with CPA firm clients and the end-user client relationships that flow from those relationships. (*Id.*)

The importance of the relationship between Avantax and CPA firm clients, and the protection of the trade secrets and confidential information developed by Avantax relating to those relationships, cannot be overstated. (Maxey Aff. ¶ 11.) When Avantax loses a relationship with a CPA firm client, it also often loses the critical end-user client relationships that flowed from the CPA firm client relationship. (*Id.*) Moreover, Avantax also loses the valuable pool of *prospective* end-user clients that it would have served in collaboration with the CPA firm client over years and years because of the destruction of the underlying relationship with the CPA firm client. (*Id.*)

This lost opportunity is immeasurable – it is literally impossible to know the numbers of unidentifiable prospective end-user clients that would have resulted from a continued relationship with the CPA firm client. (Maxey Aff. ¶ 12.) That is why it is extremely important for Avantax to protect its relationships with its CPA firm clients from being damaged by, among other things,

requiring employees to sign restrictive covenants as a condition of employment that put in place reasonable post-employment restrictions on, among other things, an employee's ability to disclose Avantax's confidential information or solicit Avantax consumer and business clients, including CPA firm clients with which Avantax has developed relationships. (*Id.*)

Avantax seeks to protect trade secrets, proprietary, and confidential information pertaining to CPA firm clients which include, but are not limited to: identities of individual contacts; relationship leads or managers; the CPA firm client's business and habits; its business relationships, products, and services (including pricing, costs, sales, and content); the CPA firm client's financial information and measures, business methods, future business plans, short-term and long-term development goals, fee arrangement, commissions, and proprietary partnership strategies; and proposals developed over time to enhance Avantax's relationships with CPA firm clients. (Maxey Aff. ¶ 13.)  Similarly, Avantax seeks to protect trade secrets, proprietary, and confidential information pertaining to end-user clients (both individuals and businesses) include, but are not limited to: identities of current and prospective clients; unique client investment profiles; client needs and requirements, preferences, businesses and habits; business relationships; products and services; sensitive financial information; business methods; future business plans; and the draft wealth plan summaries, recommendations, and strategies developed and considered over years.  (Maxey Aff. ¶ 14.)

Avantax also invests a substantial amount of time and money in developing its relationships with CPA firm clients.  (Maxey Aff. ¶ 15.)  The efforts by Avantax may include, but are not limited to: introductory meetings; generation of paperwork; document review; creation of a confidential profile; internal conversations and meetings regarding prospective end-user clients; external and confidential conversations with prospective end-user clients; and other confidential information.

6

(*Id.*)  All of this information is extremely valuable to Avantax, unknown to the general public or Avantax's competitors, and the source of Avantax's competitive advantage in the industry. (Maxey Aff. ¶ 16.)  Avantax goes to great lengths to maintain the secrecy of its trade secrets, proprietary and confidential business information, including by regularly requiring employees to enter into non-solicitation and confidentiality agreements.  (Maxey Aff. ¶ 17.)

## II.    CARIGNAN'S EMPLOYMENT WITH AVANTAX

Carignan commenced employment with Avantax on May 20, 2013 as a Senior Financial Advisor.  (Maxey Aff. ¶ 18.)  He worked in a remote/hybrid basis from both his home in Georgia, and in-person, on location, at CPA firm clients located primarily in Florida, and end-user clients also lived in other states, including Alabama, California, Colorado, Georgia, Idaho, Kansas, North Carolina, and Virginia.  (*Id.*)  On or around August 21, 2017, Carignan's title changed from Senior Financial Advisor to Financial Planning Consultant ("FPC").  (Maxey Aff. ¶ 19.)

### A.    Carignan's Work and Restrictive Covenants with Avantax

Upon becoming an FPC, Carignan was entitled to an incentive compensation plan that included revenue sharing for both revenue retention, as well as revenue growth on accounts (including CPA firm client relationships) for which Carignan was the assigned representative. (*Id.*) As an FPC, Carignan served end-user clients, in collaboration with CPA firm clients, primarily by providing financial planning, securities transactions, insurance, and related wealth management services. (Maxey Aff. ¶ 20.)  Carignan's responsibility included serving current and prospective Avantax clients, including CPA firm clients and end-user clients that received the financial planning and other services Avantax provided.  (*Id.*)  In this role, Carignan was a primary point of contact for Avantax with CPA firm clients that Avantax assigned to him. (*Id.*)

As Carignan's incentive compensation included revenue sharing for the accounts he serviced, Carignan benefited directly from the CPA firm client relationships that others at Avantax

had cultivated and that were assigned to him for servicing, including maintaining already existing relationships developed between Avantax and its CPA firm clients. (Maxey Aff. ¶ 21.) The most recent new relationship *given* to Carignan for service occurred in July 2022. (*Id.*) That relationship involved a business arrangement in which Avantax purchased and acquired a portion of the CPA firm client's revenue stream. (*Id.*) As part of that arrangement, continued payments by the CPA firm client to Avantax are directly tied to Avantax's retention of the CPA firm client's end-user clients. (*Id.*) In other words, the loss of a relationship between Avantax and the end-user client may result in reduction of the number of continuing payments made by the CPA firm client to Avantax. (*Id.*) Carignan paid for no portion of this business, yet he derived a direct financial benefit from his servicing of the end-user client accounts resulting from Avantax's arrangement with the CPA firm client. (*Id.*)

During his employment, Carignan became intimately familiar with proprietary and confidential information of Avantax regarding its clients—both end-user clients and CPA firm clients. (Maxey Aff. ¶ 22.) Based on the position he held with Avantax and his duties and responsibilities, Carignan had nearly unlimited access to Avantax's trade secrets, proprietary information, and confidential information during his employment. (*Id.*) This information included, but was not limited to, confidential information regarding: Avantax's clients; prospective clients; various investment products; proprietary software; financial and accounting data; marketing strategies; and Avantax's products and services. (*Id.*) Carignan was provided access to Avantax's most sensitive trade secrets and confidential information regarding: Avantax's business and strategic and marketing plans; the CPA firm clients and end-user clients which Avantax paid him to service and maintain relationships; and the terms of Avantax's relationships with CPA firm clients and end-user clients. (*Id.*)

Carignan regularly provided services to the clients of Avantax, which required him to, among other things, obtain, collect, and utilize the confidential information of Avantax and the clients of Avantax which he serviced. (Maxey Aff. ¶ 23.)   In addition, Carignan had access to Avantax's: fee structures and pricing; clients; prospective clients; various investment strategies and terms; financial and accounting data; marketing strategies; proprietary product review and analysis developed by others at Avantax; and other confidential financial information relating to Avantax's business. (Maxey Aff. ¶ 24.)   Through his employment and tenure with Avantax, Carignan also regularly attended high-level meetings—including with management, CPA firm clients, and prospective clients, including prospective CPA firm clients—which further granted him access to Avantax's trade secrets, business strategies, proprietary information, and confidential information.  (Maxey Aff. ¶ 25.)

Because of the work Carignan performed for Avantax, and because of the sensitivity of the information to which he had access, Avantax required that he agree to certain confidentiality and non-solicitation provisions. (Maxey Aff. ¶ 26.)  On July 18, 2016, Carignan signed the Agreement Ancillary whereby he promised to certain restrictions on his use, disclosure, or retention of Avantax's confidential information, as well as restrictions on his solicitation of Avantax clients or employees upon the termination of his employment relationship with Avantax.  (Maxey Aff. ¶ 27; Ex. A.).  By signing the Agreement Ancillary, Carignan affirmed his commitment not to solicit CPA firm clients and end-user clients with which he did business and to which he was provided access while an employee of Avantax.  (Maxey Aff. ¶ 27)

Section 1 of the Agreement Ancillary provides as follows:

> 1. <u>Non-disclosure of Information</u>. Employee covenants and agrees that he/she will not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has

9

been obtained by or disclosed to him/her as a result of his/her employment either before or after the date hereof by Employer. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to Employer, including, but not be limited to, information relating to such matters as Employer's trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of Employer, pricing practices for Employer's services, marketing and sales practices of Employer, financial information relative to Employer, any other information which could prove beneficial in enabling a competitor to compete with Employer, and all other information related to Employer's Business.

Employee agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to Employer's operations and business, whether prepared by Employee or not, and all objects associated therewith, including, but not limited to, access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by Employer, are the sole and exclusive property of Employer. Employee shall not, except for Employer use, copy or duplicate any of the aforementioned items, nor remove them from the Employer's facilities, nor use any information concerning them, except for Employer's benefit, either during the term of this Agreement or thereafter. Employee expressly agrees to deliver all of the aforementioned items in his/her possession to Employer on termination of this Agreement, or at any other time on Employer's request, together with Employee's written certification of compliance.

(Ex. A, ¶ 1.)

In addition, Carignan expressly agreed in the Agreement Ancillary to certain restrictions on his ability to solicit certain Avantax clients or employees after his employment had ended.

Section 2 of the Agreement Ancillary states:

2. Anti-Piracy Covenants. Employee acknowledges that the services he/she is to render pursuant to this Agreement are of a special character with a unique value to Employer, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Employer of the services of Employee for

which Employer has contracted hereunder and because of the confidential information to be obtained by or disclosed to Employee, Employee covenants and agrees as follows:

a) Notwithstanding and in addition to the above, during Employee's employment and for a period of two years after he/she ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer, any client, account or location of Employer with which Employee has had any contact as a result of his/her employment either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to his/her employment with Employer.

b) During Employee's employment and for a period of two years after he/she ceases to be employed by Employer (for any reason whatsoever), Employee shall not, directly or indirectly, solicit for employment or employ any employee of Employer, nor shall Employee, directly or indirectly, offer employment or assist any third party in offering employment (whether as an employee or contractor) to an employee of Employer, without the prior written consent of Employer. For purposes of this paragraph 2(b), an "employee of Employer" shall be any employee of Employer as of the date Employee ceases to be employed by Employer or any such employee of Employer who was employed by Employer during the one-year period prior to Employee's termination of employment with Employer.

(*Id.*, ¶ 2.). Carignan further expressly agreed in the Agreement Ancillary to pay liquidated damages in the event he breached the Agreement Ancillary. Section 3 of the Agreement Ancillary states:

3. Liquidated Damages. Employee agrees that violation of any of the covenants or agreements contained in paragraphs 1 or 2 hereof shall cause damage to Employer, which damage may be difficult to subsequently demonstrate. Consequently, the parties acknowledge and agree that for each breach of this Agreement that results in the loss of one or more of Employer's clients, Employee shall pay liquidated damages, for each and every client lost by Employee's breach of this Agreement, in an amount equal to the regularly

occurring annual fee that would have been earned by such lost client (based upon the most recent annual fee for recurring services charged to such client). Additionally, the parties hereto agree and acknowledge that for each breach of paragraph 2(b) herein, Employee shall pay to Employer liquidated damages equal to fifty percent (50%) of the annual compensation paid to such employee during the twelve (12) month) period immediately preceding such employee's termination of employment with Employer, or the twelve (12) month period immediately preceding such solicitation of employee, as the case may be. Employee acknowledges that such liquidated damages are fair and reasonable in light of the anticipated or actual loss that would be caused by a breach of this Agreement. The remedies provided for in this paragraph 3 shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Employer is or may be entitled at law or in equity or under this Agreement.

(*Id.*, ¶ 3.) The Agreement Ancillary is governed by and interpreted under the laws of the State of Iowa. Section 9 of the Agreement Ancillary expressly states that "[t]he construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa." (*Id.*, ¶ 9.)

On June 20, 2019, Carignan further agreed to protect Avantax's confidential information by signing the Proprietary Agreement. (Maxey Aff. ¶ 28; Ex. B.). The Proprietary Agreement states in relevant part:

2. Conflicting Employment; Return of Confidential Material

I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge, or data of the Company which I may produce or obtain during the course of my employment.

12

(Ex. B, ¶ 2.)  The post-employment restrictions Carignan agreed to in the Agreement Ancillary and the Proprietary Agreement are collectively referred to as the "Restrictive Covenants."  (Maxey Aff. ¶ 29.)

### B.    Carignan's Access to Avantax's Confidential and Proprietary Information

While at Avantax, Carignan worked with a team of professionals servicing relationships with CPA firm clients and servicing end-user clients located in Alabama, California, Colorado, Florida, Georgia, Idaho, Kansas, North Carolina, and Virginia.  (Maxey Aff. ¶ 31.)  As a part of this team, Avantax provided training and information to Carignan regarding, among other things: Avantax's business model and its relationships with CPA firm clients; Avantax's clients; Avantax's potential clients; various investment products; financial and accounting data; marketing strategies; and access to Avantax's products and services to help Carignan better serve Avantax clients.  (*Id.*)  Except for Carignan's signing of the Agreement Ancillary and Proprietary Agreement, including his assent to the Restrictive Covenants set forth therein, Avantax would not have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow Avantax's CPA firm clients.  (Maxey Aff. ¶ 32.)

During Carignan's employment with Avantax, Avantax assigned Carignan numerous existing CPA firm clients (which included the end-user clients of those CPA firm clients) and provided him with support to recruit additional CPA firm clients to Avantax. (Maxey Aff. ¶ 33.) Avantax also assigned Carignan to numerous new and developing CPA firm clients so that he could cultivate and grow relationships with those CPA firms and the current and prospective end-user clients.  (*Id.*)  Carignan was only able to grow and maintain the business with these CPA firm clients due to the access Avantax provided him to its resources and proprietary and confidential information.  (*Id.*)

The pricing and commission agreements Avantax has with its CPA firm clients are highly confidential, and Carignan would not have had knowledge of this information but for his employment with Avantax. (Maxey Aff. ¶ 34.) These and the other trade secrets and confidential and proprietary information to which Carignan was granted access are highly valuable and, if he were allowed to solicit Avantax clients, would put Carignan and his new employer in the position of being able to unfairly compete with Avantax for relationships with CPA firm clients and end-user clients by, among other things, offering financial services with more advantageous commission or pricing structures. (*Id.*) That is precisely why Avantax required Carignan to agree to the Restrictive Covenants as set forth in the Agreement Ancillary and Proprietary Agreement. (*Id.*) Again, Avantax would never have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow relationships with CPA firm clients and end-user clients (including the confidential information, trade secrets, and other resources he used to develop client portfolios on behalf of Avantax) if he had not signed the Agreement Ancillary and the Proprietary Agreement. (*Id.*)

Carignan was compensated by Avantax throughout his employment to develop, cultivate, maintain, and grow relationships with CPA firm clients and end-user clients on Avantax's behalf, and his incentive compensation included sharing in revenues generated by CPA firm clients serviced. (Maxey Aff. ¶ 35.) Despite the fact that Carignan agreed not to solicit CPA firm clients and end-user clients that Avantax paid him to develop and grow, that is exactly what Carignan is currently trying to do – steal Avantax's CPA firm client and end-user client relationships for the benefit of himself and his new employer, all in violation of his contractual and legal obligations to Avantax. (*Id.*)

**III.    CARIGNAN ABRUPTLY RESIGNS FROM AVANTAX, IMMEDIATELY ACCEPTS EMPLOYMENT WITH MARINER, AND BEGINS UNLAWFULLY SOLICITING AVANTAX'S CLIENTS**

On Friday, September 29, 2023, at 10:02 a.m., Carignan sent an email to Aaron Maxey ("Maxey") with an attachment, purportedly to notify Maxey that Carignan was immediately terminating his Avantax employment agreements with Avantax.  (Maxey Aff. ¶ 37) Five minutes later, at 10:07 a.m., Carignan sent a *second* email to Maxey in which he claimed that he was now immediately terminating his employment and accepting employment with Mariner in Georgia, effective immediately.  (*Id.*)  Additionally, Carignan included contact information for his attorney for "any legal matters that require my attention."  (*Id.*; Ex. C.)

It is beyond dispute that Carignan's new employer, Mariner, is a direct competitor of Avantax (Maxey Aff. ¶¶ 41-43.)   Among other things, Mariner provides: wealth advice; tax planning and preparation; risk management services; investment management; estate planning and trust services; and specialized business services.  (Maxey Aff. ¶ 42.)  Mariner has approximately 89 offices throughout the United States, including in Atlanta, just minutes from an Avantax CPA firm client located in Georgia for which Carignan possessed proprietary and confidential information.  (Maxey Aff. ¶ 43.)  In his new position at Mariner, Carignan is performing in the same financial advisory capacity as he did for Avantax.  (Maxey Aff. ¶ 44.)

**IV.    CARIGNAN BREACHES THE AGREEMENT ANCILLARY AND PROPRIETARY AGREEMENT AND MARINER TORTIOUSLY INTERFERES WITH THOSE CONTRACTS**

Upon resigning his employment with Avantax and commencing his employment with Mariner, Carignan began pursuing Avantax's clients to move their business to Mariner.  (Maxey Aff. ¶ 40) Avantax has learned that Carignan has contacted at least two CPA firm clients he worked with while at Avantax to attempt to steal the relationship from Avantax.  (*Id.*)  Avantax further has information that Carignan has solicited current end-user clients of Avantax for which Carignan

was responsible during his employment with Avantax. (*Id.*) Carignan has solicited many Avantax clients in the days since he left. (*Id.*) Carignan has already successfully solicited and converted at least 16 Avantax client accounts to Mariner in one week. (*Id.*)

On October 20, 2023, Avantax notified Carignan's attorney and Mariner, respectively, by letter of Carignan's Agreement Ancillary and the Proprietary Agreement and his violations of the same (including violations of the confidentiality and non-solicitation provisions contained therein), and demanded that Carignan immediately cease its interference with those contractual obligations. (Maxey Aff. ¶ 38; Exs. D & E). Despite due notice to Carignan's attorney and Mariner that Carignan's solicitation of Avantax's clients and customers using Avantax's confidential information constitute clear violations of the Agreement Ancillary and the Proprietary Agreement, Mariner has allowed and supported Carignan's solicitation of Avantax's clients on its behalf. (Maxey Aff. ¶ 39)

Although Avantax can identify the amount of assets under management that are lost due to Carignan's unlawful solicitation of these Avantax clients, it is impossible for Avantax to calculate the amount of potential prospective revenue lost based on the fact that the damage extends beyond simply the fee-based revenue that could be calculated from the current assets under management if he is permitted to unlawfully continue his employment with Mariner and solicit the CPA firm clients and end-user clients with which Avantax does business. (Maxey Aff. ¶ 47) It is impossible for Avantax to know whether a continued relationship with such clients would have resulted in those clients retaining Avantax for additional fee-generating wealth management services, what other opportunities such a successful relationship may have led to (such as, for example, a referral to other family members or acquaintances of such clients), and how those clients' portfolios would have performed over a lengthy period of time based on the market's performance and the future

structure of those clients' specific portfolios under Avantax's management (which could easily differ from how another firm, such as Mariner, might structure the portfolios). (*Id.*) Carignan's violation of the Agreement Ancillary and the Proprietary Agreement, along with Mariner's unjustified interference with those contracts, has and will continue to cause Avantax irreparable harm, including loss of business, injury to customer good will, and disclosure of trade secrets and confidential information, as well as incalculable economic damages. (Maxey Aff. ¶ 50)

## **LEGAL ARGUMENT**

### I.   **LEGAL STANDARD.**

Iowa Rule of Civil Procedure 1.1502 provides that temporary injunctions are appropriate to enjoin actions causing "great[] or irreparabl[e] harm" or violations of a right "tending to make the judgment ineffectual." Iowa R. Civ. P. 1.1502; *Max 100 L.C. v. Iowa Realty Co*., 621 N.W.2d 178, 181 (Iowa 2001). Further, Rule 1.1502(3) authorizes injunctive relief "[i]n any case specially authorized by statute[,]" and Iowa Code § 550.3(1) permits the owner of a trade secret to petition the court to enjoin "actual or threatened misappropriation." For injunctions to issue, the "party seeking the injunction must establish: (1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy available." *Sear v. Clayton County Zoning Bd. of Adjustment*, 590 N.W.2d 512, 515 (Iowa 1999).

The standard described in *Sear* for permanent injunctions is the same for temporary injunctions, except temporary injunctions require only a showing of the likelihood of success on the merits whereas permanent injunctions require actual success. *PIC USA v. N.C. Farm P'ship*, 672 N.W.2d 718, 723 (Iowa 2003) (citing *Max 100 L.C.*, 621 N.W.2d at 181). In determining whether to grant temporary injunctions, courts also consider the "circumstances confronting the

parties and balance the harm that a temporary injunction may prevent against the harm that may result from its issuance." *Kleman v. Charles City Police Dep't,* 373 N.W.2d 90, 96 (Iowa 1985).

All of these factors weigh in favor of injunctive relief in this matter, so Avantax is entitled to a temporary injunction against Carignan and Mariner here.

## II.    AVANTAX HAS A STRONG PROBABILITY OF SHOWING AN INVASION OR THREATENED INVASION OF A RIGHT.

Injunctive relief is appropriate here first because Avantax is likely to succeed in showing that Mariner and Carignan have invaded and are threatening to invade its rights.  Avantax is likely to succeed on all of its claims for breach of contract, trade secrets violations, and tortious interference with contract.  Iowa Courts do not require an overwhelming showing to succeed on this issue for purposes of obtaining preliminary injunctive relief.  Instead, only a showing of likelihood, not a showing of actual success is required.  *See, e.g.*, *PIC USA*, 672 N.W.2d at 723; *see also PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (citations and internal punctuation omitted) ("[T]he Eighth Circuit has rejected a requirement as to a party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.").  Rather, courts simply require that the movant instead show that the claim "provides a fair ground for litigation." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted).[2]  As set forth below, this factor weighs in favor of issuing a temporary injunction.

---

[2] Where there is "substantial similarity" between an Iowa Rule of Civil Procedure and the Federal Rule of Civil Procedure, Iowa Courts can "look to the federal decisions for guidance.*" State ex rel. Iowa Dep't of Human Servs. v. Duckert*, 465 N.W.2d 871, 873 (Iowa 1991).  Here, like Iowa Rule 1.1502, Federal Rule of Civil Procedure 65 requires a showing of an "immediate and irreparable injury" for a temporary restraining order to issue.

## A. Avantax Is Likely to Succeed on the Merits of Its Breach of Contract Claim Against Carignan.

Avantax has a high likelihood of success on the merits of its breach of contract claims. Carignan has undeniably breached the plain terms of the Agreement Ancillary and the Proprietary Agreement by commencing employment with Mariner and soliciting Avantax's clients for his and Mariner's benefit and using confidential information and trade secrets to do so. Because the evidence of breach cannot reasonably be in dispute (as set forth in detail above), the only question is whether the anti-solicitation provision set forth in the Agreement Ancillary is somehow unenforceable. As set forth below, however, the anti-solicitation provision contained in the Agreement Ancillary is fully enforceable and, as a result, Avantax is almost certain to prevail on the merits of its contract claim.

The anti-solicitation provision in the Agreement Ancillary is reasonable and enforceable. Restrictive covenants such as the ones at issue here are enforceable where: (1) the restriction is reasonably necessary for the protection of the employer's business; (2) the restriction is not unreasonably restrictive of the employee's rights; and (3) the restriction is not prejudicial to the public interest. *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 373-74 (Iowa), *reh'g denied and opinion modified,* 190 N.W.2d 413 (Iowa 1971). As the Iowa Supreme Court has held, "these rules require us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983).

Avantax's interest in protecting its clients, goodwill, confidential information, and trade secrets are reasonable and enforceable as necessary for the protection of Avantax's business. *See Presto-X-Co. v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989) (recognizing that the "injury to the company would be irreparable in the absence of an injunction because the customers [the

19

defendant] pirated from the company would be permanently lost"); *see also Amer. Express Fin.*
*Advisors v. Yantis*, 358 F. Supp. 2d 818, 830, 836 (N.D. Iowa 2005) (loss of goodwill is irreparable
harm); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1433 (N.D. Iowa 1996); *REG
Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 859 (S.D. Iowa 2013). Further, the scope of the
anti-solicitation provision is not unreasonably restrictive of Carignan's rights and is not prejudicial
to the public interest – in fact, the anti-solicitation provision here is narrowly tailored to protect
Avantax's customer goodwill, client relationships, and confidential information by simply
restricting Carignan from soliciting the clients that Avantax provided Carignan and paid him to
cultivate relations with on its behalf. Iowa courts routinely uphold restrictions comparable to those
present here. *See e.g. Ehlers*, 188 N.W.2d at 374 (2-year restriction reasonable); *NCMIC Fin.
Corp. v. Artino*, 638 F. Supp.2d 1042, 1072 (S.D. Iowa 2009) (18 month restrictive covenant found
reasonable); *Uncle B's Bakery*, 920 F. Supp. at 1433 (noting that restrictions up to five years are
enforceable); *Harden*, 938 F. Supp. 2d at 860 (holding a two-year restriction was enforceable for
purposes of preliminary injunction analysis); *Amer. Express*, 358 F. Supp. 2d at 836 (enforcing
post-employment covenant preventing financial advisor from soliciting current customers and
being a financial advisor for one year after termination of employment); *Moore Bus. Forms, Inc.
v. Wilson*, 953 F. Supp. 1056, 1065 (N.D. Iowa), *aff'd,* 105 F.3d 663 (8th Cir. 1996) (holding a
post-employment non-solicitation provision prohibiting sales to customers that the defendant
former employee dealt with during his last year was enforceable for purposes of preliminary
injunctive relief). There can be little doubt that the anti-solicitation provision to which Carignan
agreed meets the requirements for enforcement under Iowa law.[3]

---

[3] Even were the Court to find Carignan's non-solicitation agreement overbroad in any respect
(which Avantax denies), the Court has the power to modify the restriction to make the scope
enforceable. *See, e.g., Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa Ct. App.

**B.     Avantax Is Likely to Succeed on the Merits of Its Tortious Interference Claim Against Mariner.**

The elements of a tortious interference with contract claim are: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001) (citations and internal punctuation omitted).  Avantax can prove each of these elements and, accordingly, is likely to succeed on the merits of this claim against Mariner.

As established above, Avantax can easily demonstrate the existence and enforceability of the Agreement Ancillary (which contains the valid and enforceable restrictions on Carignan's post-employment activities) and the Proprietary Agreement.  Further, Mariner cannot dispute that it has knowledge of the Agreement Ancillary and the Proprietary Agreement and that it is procuring and supporting Carignan's breaches—indeed, in the last three years, Mariner has recruited at least six Avantax employees with full knowledge of their contractual obligations to Avantax (and was involved in litigation in Minnesota, Iowa, and South Dakota regarding Mariner's poaching of these employees and interference with their contractual obligations).  There is no proper motive for Mariner to unlawfully poach Avantax employees who are subject to such obligations.  Finally, the damages to Avantax and causation could not be clearer – Carignan and Mariner are actively soliciting Avantax clients by using Avantax's trade secrets and other confidential information, and Mariner is putting Avantax at a great risk of losing (and continuing to lose) clients as a result of Mariner's interference with the Agreement Ancillary and the Proprietary Agreement.  Avantax

_____

1992).  In fact, doing so would effectuate the parties' agreement in the Agreement Ancillary, so the Court should do so and enforce the Restrictive Covenants to the maximum extent permissible under the law.

will prevail on its interference claim.  Because Avantax is very likely to prevail on all of its claims, this factor weighs strongly in favor of issuing an injunction.

### C.     Avantax's Iowa Trade Secrets Claim Will Succeed.

Avantax is likely to succeed on its claim for misappropriation of trade secrets under Iowa law.  Iowa Code Section 550 prohibits the misappropriation of trade secrets and allows owners whose trade secrets have been misappropriated to recover damages and seek injunctive relief. Iowa Code §§ 550.3-550.4.  Iowa defines "trade secrets" very broadly to include virtually all information that a company keeps secret if it provides a competitive advantage.  "[A] broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets." *Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 646-47 (Iowa 1995) (citation omitted).  Trade secrets include "such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures." *Id.*; *see also* § Iowa Code 550.2(4).  Avantax maintains a competitive advantage through the information it develops, compiles, and maintains about its customers, fees, and pricing. If former employees disclose Avantax clients to new, competing employers, those companies can undercut Avantax's prices to steal Avantax's business.  Avantax takes steps to protect that information, including by having employees sign confidentiality agreements.  And there is no doubt that Carignan has disclosed and attempted to use Avantax's confidential information at Mariner, which constitutes misappropriation under Iowa law.  Iowa Code § 550.2(3)(b).

At a minimum, there is a threat that Carignan will disclose Avantax's confidential information about its pricing and fee structures in an effort to entice Avantax clients to join Mariner.  That threat is sufficient to enjoin Carignan.  *See* Iowa Code § 550.3(1) ("The owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation."); *see also Barilla Am., Inc. v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069, at *9 (S.D. Iowa

July 5, 2002) (enforcing restrictive covenant where, as here, employee had significant access to trade secrets under the doctrine of "inevitable disclosure"). Accordingly, Avantax is likely to succeed on its trade secret claim against Carignan, and the Court should issue an injunction based on Iowa Code § 550.3(1).

## III. AVANTAX WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ENJOIN CARIGNAN AND MARINER FROM SOLCITING AVANTAX'S CLIENTS.

Avantax will suffer significant and irreparable harm without an immediate injunction that prohibits Carignan from soliciting Avantax's clients and that prohibits Mariner's continued interference through its employment of Carignan and support of his unlawful actions. As an initial matter, the agreement between Carignan and Avantax that Avantax will be irreparably harmed by Carignan's breaches is dispositive. (Ex. A, ¶ 5.) Where, as here, parties agree that a breach of a contract (or a threatened breach) will create irreparable harm, Iowa courts abide by that agreement and hold that irreparable harm exists. For example, in *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, the Iowa Supreme Court held that "[w]hen injunctive relief is part of the remedy that the parties stipulated in their agreement, the district court should issue the injunction." 510 N.W.2d 153, 158 (Iowa 1993). Likewise, in *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996), the parties agreed that any violation of the contract at issue would "cause Company immediate and irreparable harm which money damages cannot adequately remedy. Therefore, upon any actual or impending violation of th[e] Agreement," the defendant "consent[ed] to issuance by any court of competent jurisdiction . . . a preliminary injunction . . . without bond." *Id*. at 1414. In fact, the court held that it could infer a threat of irreparable harm from the defendant's breach of the contract based on the "threat of a breach of the agreement" alone. *Id.* at 1434. Based on the existence of this language in the agreement, the Court in *Uncle B's* granted the requested preliminary injunction. *Id.*; *see also REG Seneca, LLC*

*v. Harden* 938 F. Supp. 2d 852, 860 (S.D. Iowa 2013) (finding irreparable harm based on the parties' agreement); <u>Presto-X-Co.</u>, 442 N.W.2d at 89 (holding "a permanent injunction was clearly required…because injunctive relief [wa]s part of the remedy that the parties stipulated in their agreement") *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1046 (N.D. Iowa 2008) (observing that the parties' agreement would have sufficiently demonstrated irreparable harm if it had been violated). Carignan expressly agreed that Avantax would suffer irreparable harm in the event of a breach or threatened breach of the Agreement Ancillary.  The Court must therefore enforce Carignan's agreement that his breach of the Agreement Ancillary causes irreparable harm and hold that Avantax has met its burden of proving irreparable harm.

Moreover, Courts routinely hold that irreparable harm results and can be inferred from a former employee soliciting customers in breach of a restrictive covenant.  *See Medtronic, Inc. v. Gibbons,* 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982).  For example, in *Benfield, Inc. v. Moline*, the court held that the likelihood of "los[ing] valuable business relationships and good will" was irreparable harm sufficient to sustain an injunction enforcing an employee's restrictive covenant.  351 F. Supp. 2d 911, 918 (D. Minn. 2004). Similarly, in *Medtronic, Inc. v. Advanced Bionics Corp.*, the court held that "irreparable injury can be inferred from the breach of a restrictive covenant if [a] former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business." 630 N.W.2d 438, 452 (Minn. Ct. App. 2001) (citations omitted); *see also Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (citation omitted) (alteration in original) ("Irreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'"); *Moore Bus. Forms, Inc.*, 953 F. Supp. at 1062 (holding that "mere violation of a valid [restrictive] covenant…supports an inference of the existence of a threat of

irreparable harm"). In sum, Carignan's attempt to steal Avantax's CPA firm clients and end-user clients for his and Mariner's financial gain will create irreparable harm that demands injunctive relief.

## IV.     AVANTAX HAS NO ADEQUATE REMEDY AT LAW.

Related to Avantax's irreparable injury, it has no adequate remedy at law. As an initial matter, as discussed above, the value of Avantax's relationships with its clients and CPA firm partners cannot be measured and cannot be redressed with an award of money damages. *See, e.g.*, *Planned Parenthood of Mid-Iowa v. Maki*, 478 N.W.2d 637, 640 (Iowa 1991) (party had no adequate remedy at law where, among other things, money damages were not sufficient). Even where monetary damages may also be awarded, the issuance of an injunction is still necessary and appropriate. *See Presto-X Co.*, 442 N.W.2d at 90 (ordering issuance of injunction and determination of damages by district court on remand); *see also Orkin Exterminating Co. v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1966) (same).

## V.     THE BALANCE OF HARMS WEIGHS IN FAVOR OF A PRELIMINARY INJUNCTION.

The balance of harms weighs heavily in favor of Avantax and favors issuance of a preliminary injunction in this case. Because an injunction will only prohibit Carignan and Mariner from engaging in illegal conduct in which they have no right to engage (breaching and interfering with Carignan's contracts and misappropriating trade secrets), issuance of an injunction will not result in any recognizable harm to Carignan or Mariner. Courts have routinely found the balance of harms weighs in favor of plaintiffs is such situations. *See e.g. N.I.S Corp. v. Swindle.*, 724 F.2d 707, 710 (8th Cir. 1984) (holding that the balance of equities weighs in favor the plaintiff where restrictive covenants are at issue); *Uncle B's Bakery*, 920 F. Supp. at 1437 (finding the balance tipped in favor of injunction where plaintiff would suffer significant injury, economic and non-

economic, if disclosure of its confidential information and trade secrets were not enjoined); *Reg Seneca*, 938 F. Supp. 2d at 861 (holding that the balance of harms favors an employer where the employer took great care to protect its confidential information and significant investments with restrictive covenants).

Here, Avantax only requests that the Court enjoin Carignan and Mariner from breaching or interfering with the Agreement Ancillary and Proprietary Agreement, including prohibiting Carignan and Mariner's unfair competition, use and misuse of confidential information, and solicitation of Avantax's clients. By virtue of Carignan's use of Avantax's confidential information to solicit Avantax's existing and prospective clients, Avantax will lose the benefit of its goodwill, trade secrets and confidential information, market position, and ultimately clients and customers. Such harm is substantial, and when compared to any harm Carignan or Mariner might allege, weighs heavily in favor of injunctive relief.

## CONCLUSION

Based on the foregoing, Avantax respectfully requests that the Court grant the instant Application for a Preliminary Injunction. Request for Oral Argument is hereby made by Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc.

Date:  October 24, 2023

/s/ Alenah A. Luthens
Alenah A. Luthens, AT0015288
aluthens@littler.com
Jeremy D. Sosna (*pro hac vice pending*)
jsosna@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR PLAINTIFFS**

| Proof of Service |
| --- |
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on October 24, 2023, by: |
| ☒ Hand Delivered   ☐ United States mail<br>☐ Federal Express   ☐ Other (CM/ECF) |
| Signature: */s/  Alenah A. Luthens* |

## IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

| | |
|---|---|
| Avantax Planning Partners, Inc.; and Avantax, Inc. | Court File No. _____ |
| **Plaintiffs,** | **AFFIDAVIT OF AARON MAXEY** |
| vs. | |
| Michael Carignan; and Mariner, LLC, d/b/a Mariner Wealth Advisors. | |
| **Defendants** | |

STATE OF IOWA      )
                      ) ss.
COUNTY OF DUBUQUE  )

I, Aaron Maxey, being first duly sworn, state and allege as follows:

1.     I am over the age of eighteen, and I make the statements contained in this Affidavit based upon my own personal knowledge and in support of the Application for a Temporary Injunction of Plaintiffs Avantax Planning Partners, Inc. and Avantax, Inc. (collectively "Plaintiffs").

2.     I am currently the Director of Financial Planning Consultants of Avantax. I joined Avantax in 2022. In my capacity as Director of Financial Planning Consultants, I manage and oversee the Avantax team of financial planning consultants ("FPCs") employed by Avantax, including Defendant Michael Carignan ("Carignan"), and assist them in working with CPA firms to design and implement wealth management and transfer strategies for clients. Among other things, I am responsible for hiring FPCs, reviewing and evaluating FPCs' performance, setting FPC compensation, working with FPCs to set revenue goals and create strategies to increase assets under management ("AUM") for the FPC and helping to integrate FPCs into the CPA firms with which Avantax works (along with other Avantax teammates).

3.     Avantax, Inc. is a wealth advisory firm founded in 1983 by a CPA to provide financial planning and wealth management services with a tax-focused lens. The firm is a pioneer in the tax-focused financial planning movement and its comprehensive investment services include strategies and solutions in investment, retirement planning, business planning, cash-flow management, family and education planning, and legacy planning.

4.     Avantax, Inc. offers two distinct, but related, models within its business: (1) the independent financial professional model through its subsidiary Avantax Wealth Management and related entities; and (2) the employee-based model, through its subsidiary Avantax Planning Partners, Inc. ("Avantax")[1], which offers services through a registered investment advisory ("RIA") and insurance agency by partnering and collaborating closely with CPA firms ("CPA firm clients") to provide consumer and business clients ("end-user clients") with tax-focused holistic and comprehensive financial planning and advisory services.

5.     Avantax considers as clients both the end-user clients to whom its financial professionals provide wealth management strategies and advice, as well as CPA firm clients with whom its financial professionals collaborate. Avantax provides investment advice, as well as personal and business financial planning and retirement planning, directly to its CPA firm clients and their tax professionals, individually, thereby making those CPA firm clients end-user clients as well. Avantax has proprietary trade secrets, proprietary, and confidential information pertaining to each type of client.

6.     Avantax's niche, tax-focused financial planning service identifies and engages its customer base in a unique way that differentiates Avantax from other financial services firms.

[1] Defendant Michael Carignan was an employee serving primarily Plaintiff Avantax Planning Partners, Inc. References to "Avantax" throughout this Affidavit are to Plaintiff Avantax Planning Partners, Inc. or "APP," unless otherwise specified.

2

Unlike ordinary financial services firms, which rely on each financial professional to solicit their own customers, APP's business model involves strategically developing focused partnerships and relationships between Avantax and CPA firm clients across the United States to provide comprehensive financial planning and wealth management services to end-user clients.

7.    Because of its roots, founded by a CPA, its brand, and the depth of its financial experience, Avantax has developed long-standing relationships with CPA firm clients across the country. Avantax's financial professionals work closely with the tax professionals with which Avantax partners to identify clients who will benefit from investment strategy and advice. Avantax and CPA firm clients jointly collaborate to provide financial planning and wealth management services by considering each end-user client's financial goals and related tax planning implications. Thus, through the relationships that Avantax has cultivated with CPA firm clients, Avantax's financial professionals can focus their time and energy on servicing the end-user clients of CPA firm clients, rather than spending the otherwise substantial time and resources necessary to source and solicit end-user clients directly.

8.    In this business model, the relationships that Avantax builds with CPA firm clients are a significant and critical source of Avantax's competitive advantage in the marketplace that extends as a benefit to its financial professionals. Avantax's CPA firm clients have a well-developed client base and, through their relationship with Avantax, are able to provide more holistic and comprehensive financial services to end-user clients. Avantax, in turn, builds upon the trust that CPA firm clients have already established with end-user clients by providing that additional strategic advice and financial planning in collaboration with CPA firm clients' tax and related planning and advice. This relationship gives Avantax a distinct competitive edge over other financial services firms that have not developed these business relationships with CPA firm

3

clients—a competitive edge that can quickly and permanently disappear if the relationships between Avantax and its CPA firm clients are damaged.

9.       Avantax invests significant time and resources developing relationships with both CPA firm clients as well as the end-user client base that flows from the relationship between Avantax and CPA firm clients, including by developing and maintaining certain trade secrets and other confidential and proprietary information relating to Avantax's business relationships with CPA firm clients and end-user clients.  In particular, Avantax prizes its confidential information regarding both its client fee structure and the fees or commissions paid to CPA firm clients. Knowledge of the compensation is highly confidential and is not known to the general public or, more importantly, Avantax's competitors.

10.       If any of Avantax's competitors were given access to this information, it would put that competitor in an unfair competitive advantage because the competitor would have the information needed to unfairly target CPA firm clients and end-user clients by undercutting the fees/commissions charged by Avantax or paid to CPA firm clients. Without such knowledge, Avantax's competitors have struggled to effectively compete for the valuable relationships with CPA firm clients and the end-user client relationships that flow from those relationships.

11.       The importance of the relationship between Avantax and CPA firm clients, and the protection of the trade secrets and confidential information developed by Avantax relating to those relationships, cannot be overstated. When Avantax loses a relationship with a CPA firm client, it also often loses the critical end-user client relationships that flowed from the CPA firm client relationship. Moreover, Avantax also loses the valuable pool of *prospective* end-user clients that it would have served in collaboration with the CPA firm client over years and years because of the destruction of the underlying relationship with the CPA firm client.

4

12.     This lost opportunity is immeasurable -- it is literally impossible to know the numbers of unidentifiable prospective end-user clients that would have resulted from a continued relationship with the CPA firm client. That is why it is extremely important for Avantax to protect its relationships with its CPA firm clients from being damaged by, among other things, requiring employees to sign restrictive covenants as a condition of employment that put in place reasonable post-employment restrictions on, among other things, an employee's ability to disclose Avantax's confidential information or solicit Avantax consumer and business clients, including CPA firm clients with which Avantax has developed relationships.

13.     Avantax's trade secrets, proprietary, and confidential information pertaining to CPA firm clients include, but are not limited to: identities of individual contacts; relationship leads or managers; the CPA firm client's business and habits; its business relationships, products, and services (including pricing, costs, sales, and content); the CPA firm client's financial information and measures, business methods, future business plans, short-term and long-term development goals, fee arrangement, commissions, and proprietary partnership strategies; and proposals developed over time to enhance Avantax's relationships with CPA firm clients.

14.     Avantax's trade secrets, proprietary, and confidential information pertaining to end-user clients (both individuals and businesses) include, but are not limited to: identities of current and prospective clients; unique client investment profiles; client needs and requirements, preferences, businesses and habits; business relationships; products and services; sensitive financial information; business methods; future business plans; and the draft wealth plan summaries, recommendations, and strategies developed and considered over years.

15.     Avantax also invests a substantial amount of time and money in developing its relationships with CPA firm clients which may include, but are not limited to: introductory

5

meetings; generation of paperwork; document review; creation of a confidential profile; internal conversations and meetings regarding prospective end-user clients; external and confidential conversations with prospective end-user clients; and other confidential information.

16.     All of this information is extremely valuable to Avantax, unknown to the general public or Avantax's competitors, and the source of Avantax's competitive advantage in the industry.

17.     Avantax goes to great lengths to maintain the secrecy of its trade secrets, proprietary and confidential business information, including by regularly requiring employees to enter into non-solicitation and confidentiality agreements. Avantax does not provide access to any of its trade secrets or other proprietary and confidential business information to members of the general public, other competitors in its industry, or to non-employees. Furthermore, investor (or end-user) client information is highly regulated in the financial industry, with state, federal, and regulatory requirements mandating confidentiality *independent* of Avantax's employment agreements. In addition, Avantax incurs great expense training and educating its employees in order to ensure compliance with these regulations as well as the highest quality of service to its clients. This training also includes guidance specifically addressing servicing and retaining relationships with the CPA firm clients that are so critical to Avantax's business model.

18.     Carignan commenced employment with Avantax on May 20, 2013. Carignan served as a Senior Financial Advisor and later as a Financial Planning Consultant. He worked in a remote/hybrid basis from both his home in Georgia, and in-person, on location, at CPA firm clients located primarily in Florida, and end-user clients also lived in other states, including Alabama, California, Colorado, Georgia, Idaho, Kansas, North Carolina, and Virginia.

6

19.     On or around August 21, 2017, Carignan's title changed from Senior Financial Advisor to Financial Planning Consultant ("FPC"). As an FPC, Carignan was entitled to an incentive compensation plan that included revenue sharing for both revenue retention, as well as revenue growth on accounts (including CPA firm client relationships) for which Carignan was the assigned representative.

20.     Carignan served end-user clients, in collaboration with CPA firm clients, primarily by providing financial planning, securities transactions, insurance, and related wealth management services. As an FPC, Carignan's responsibility included serving current and prospective Avantax clients, including CPA firm clients and end-user clients that received the financial planning and other services Avantax provided. In this role, Carignan was a primary point of contact for Avantax with CPA firm clients that Avantax assigned to him.

21.     As Carignan's incentive compensation included revenue sharing for the accounts he serviced, Carignan benefited directly from the CPA firm client relationships that others at Avantax had cultivated and that were assigned to him for servicing, including maintaining already existing relationships developed between Avantax and its CPA firm clients. The most recent new relationship *given* to Carignan for service occurred in July 2022. That relationship involved a business arrangement in which Avantax purchased and acquired a portion of the CPA firm client's revenue stream. As part of that arrangement, continued payments by the CPA firm client to Avantax are directly tied to Avantax's retention of the CPA firm client's end-user clients. In other words, the loss of a relationship between Avantax and the end-user client may result in reduction of the number of continuing payments made by the CPA firm client to Avantax. Carignan paid for no portion of this business, yet he derived a direct financial benefit from his servicing of the end-user client accounts resulting from Avantax's arrangement with the CPA firm client. Upon

7

information and belief, Carignan, with Mariner's knowledge and support, is soliciting and tortiously interfering with the relationships between Avantax and both the CPA firm client as well as the end-user clients of this particular CPA firm client, legal violations that will cause financial damage to both Avantax and the CPA firm client.

22. During his employment, Carignan became intimately familiar with proprietary and confidential information of Avantax regarding its clients—both end-user clients and CPA firm clients. Based on the position he held with Avantax and his duties and responsibilities, Carignan had nearly unlimited access to Avantax's trade secrets, proprietary information, and confidential information during his employment. This information included, but was not limited to, confidential information regarding: Avantax's clients; prospective clients; various investment products; proprietary software; financial and accounting data; marketing strategies; and Avantax's products and services. Carignan was provided access to Avantax's most sensitive trade secrets and confidential information regarding: Avantax's business and strategic and marketing plans; the CPA firm clients and end-user clients which Avantax paid him to service and maintain relationships; and the terms of Avantax's relationships with CPA firm clients and end-user clients.

23. Carignan regularly provided services to the clients of Avantax, which required him to, among other things, obtain, collect, and utilize the confidential information of Avantax and the clients of Avantax which he serviced.

24. In addition, Carignan had access to Avantax's: fee structures and pricing; clients; prospective clients; various investment strategies and terms; financial and accounting data; marketing strategies; proprietary product review and analysis developed by others at Avantax; and other confidential financial information relating to Avantax's business.

8

25. Through his employment and tenure with Avantax, Carignan also regularly attended high-level meetings—including with management, CPA firm clients, and prospective clients, including prospective CPA firm clients—which further granted him access to Avantax's trade secrets, business strategies, proprietary information, and confidential information.

26. Because of the work Carignan performed for Avantax, and because of the sensitivity of the information to which he had access, Avantax required that he agree to certain confidentiality and non-solicitation provisions.

27. On July 18, 2016, Carignan signed the Agreement Ancillary to Employment ("Agreement Ancillary"). Carignan promised in the Agreement Ancillary to certain restrictions on his use, disclosure, or retention of Avantax's confidential information, as well as restrictions on his solicitation of Avantax clients or employees upon the termination of his employment relationship with Avantax. By signing the Agreement Ancillary, Carignan affirmed his commitment not to solicit CPA firm clients and end-user clients with which he did business and to which he was provided access while an employee of Avantax. A true and correct copy of the Agreement Ancillary is attached hereto as Exhibit A.

28. On June 20, 2019, Carignan further agreed to protect Avantax's confidential information by signing an Employee Proprietary Information Agreement ("Proprietary Agreement"). A true and correct copy of the Proprietary Agreement is attached hereto as Exhibit B.

29. The post-employment restrictions Carignan agreed to in the Agreement Ancillary and the Proprietary Agreement are collectively referred to as the "Restrictive Covenants."

30. Based on Carignan's signing of the Agreement Ancillary and the Proprietary Agreement, including his assent to the Restrictive Covenants set forth therein, there can be little

9

doubt that Carignan fully understood the scope of his post-employment obligations to Avantax, obligations to which he had agreed to in order to continue employment with Avantax and the compensation he was paid to cultivate relationships with Avantax's clients (including both CPA firm clients and end-user clients). Prior to his taking employment with Mariner, Carignan has never indicated that he did not intend to fully comply with the Agreement Ancillary or the Proprietary Agreement or that he believed the Restrictive Covenants contained therein were somehow unenforceable.

31.     Carignan worked with a team of professionals servicing relationships with CPA firm clients and servicing end-user clients located in Alabama, California, Colorado, Florida, Georgia, Idaho, Kansas, North Carolina, and Virginia. As a part of this team, Avantax provided training and information to Carignan regarding, among other things: Avantax's business model and its relationships with CPA firm clients; Avantax's clients; Avantax's potential clients; various investment products; financial and accounting data; marketing strategies; and access to Avantax's products and services to help Carignan better serve Avantax clients.

32.     Except for Carignan's signing of the Agreement Ancillary and Proprietary Agreement, including his assent to the Restrictive Covenants set forth therein, Avantax would not have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow Avantax's CPA firm clients.

33.     Avantax assigned Carignan numerous existing CPA firm clients (which included the end-user clients of those CPA firm clients) and provided him with support to recruit additional CPA firm clients to Avantax. Avantax also assigned Carignan to numerous new and developing CPA firm clients so that he could cultivate and grow relationships with those CPA firms and the current and prospective end-user clients. Carignan was only able to grow and maintain the

10

business with these CPA firm clients due to the access Avantax provided him to its resources and proprietary and confidential information.

34.     The pricing and commission agreements Avantax has with its CPA firm clients are highly confidential, and Carignan would not have had knowledge of this information but for his employment with Avantax. These and the other trade secrets and confidential and proprietary information to which Carignan was granted access are highly valuable and, if he were allowed to solicit Avantax clients, would put Carignan and his new employer in the position of being able to unfairly compete with Avantax for relationships with CPA firm clients and end-user clients by, among other things, offering financial services with more advantageous commission or pricing structures. That is precisely why Avantax required Carignan to agree to the Restrictive Covenants as set forth in the Agreement Ancillary and Proprietary Agreement. Again, Avantax would never have provided Carignan access to CPA firm clients with which it works, Avantax end-user clients, or the highly valuable resources to develop and grow relationships with CPA firm clients and end-user clients (including the confidential information, trade secrets, and other resources he used to develop client portfolios on behalf of Avantax) if he had not signed the Agreement Ancillary and the Proprietary Agreement.

35.     Carignan was compensated by Avantax throughout his employment to develop, cultivate, maintain, and grow relationships with CPA firm clients and end-user clients on Avantax's behalf, and his incentive compensation included sharing in revenues generated by CPA firm clients serviced. Despite the fact that Carignan agreed not to solicit CPA firm clients and end-user clients that Avantax paid him to develop and grow, that is exactly what Carignan is currently trying to do – steal Avantax's CPA firm client and end-user client relationships for the benefit of himself and his new employer, all in violation of his contractual and legal obligations to Avantax.

36.     While employed by Avantax, Carignan routinely attended meetings in Dubuque, Iowa, for the purposes of, among other things, strategic planning. He also had regular contact with employees in the Dubuque office, and support and other services were provided to Carignan from the Dubuque office, including, but not limited to, accounting, marketing, reporting, insurance, retirement planning and financial planning support, and human resources.

37.     On Friday, September 29, 2023, at 10:02 a.m., Carignan sent me an email with no subject line, but with an attachment, purportedly to notify me that Carignan was immediately terminating his Avantax employment agreements with Avantax. Five minutes later, at 10:07 a.m., Carignan sent me a *second* email in which he claimed that he was now immediately terminating his employment and accepting employment with Mariner in Georgia, effective immediately. Additionally, Carignan included contact information for his attorney for "any legal matters that require my attention." A true and correct copy of the email attachment is attached hereto as Exhibit C.

38.     On October 20, 2023, Avantax notified Carignan's attorney and Mariner, respectively, by letter sent via email of Carignan's Agreement Ancillary and the Proprietary Agreement and his violations of the same (including violations of the confidentiality and non-solicitation provisions contained therein), and demanded that Carignan immediately cease its interference with those contractual obligations. A true and correct copy of these correspondences are attached hereto as Exhibit D and E.

39.     Despite due notice to Carignan's attorney and Mariner that Carignan's solicitation of Avantax's clients and customers using Avantax's confidential information constitute clear violations of the Agreement Ancillary and the Proprietary Agreement, Mariner, upon information and belief, has allowed and supported Carignan's solicitation of Avantax's clients on its behalf.

12

40. Upon information and belief, upon resigning his employment with Avantax and commencing his employment with Mariner, Carignan began pursuing Avantax's clients to move their business to Mariner. Avantax has learned that Carignan has contacted at least two CPA firm clients he worked with while at Avantax to attempt to steal the relationship from Avantax. Avantax further has information that Carignan has solicited current end-user clients of Avantax for which Carignan was responsible during his employment with Avantax. Carignan has solicited many Avantax clients in the days since he left. Carignan has already successfully solicited and converted at least 16 Avantax client accounts to Mariner in one week. I further believe that Carignan has engaged in direct or indirect solicitation of CPA firm clients and end-user clients with which he worked at Avantax, with the intention of requesting that these Avantax clients cease doing business with Avantax and begin doing business with Mariner.

41. Carignan's new employer, Mariner, is a direct competitor of Avantax and competes with Avantax for the same clients in the same market areas.

42. Among other things, Mariner provides: wealth advice; tax planning and preparation; risk management services; investment management; estate planning and trust services; and specialized business services.

43. Mariner has approximately 89 offices throughout the United States, including in Atlanta, just minutes from an Avantax CPA firm client located in Georgia for which Carignan possessed proprietary and confidential information.

44. It is my understanding that Carignan, in his new position with Mariner in its Atlanta, Georgia, branch location, is performing in the same financial advisory capacity as he did for Avantax.

13

45.     I am aware that Mariner's website page now advertises Carignan's employment as a Senior Wealth Advisor at Mariner. A true and correct screenshot copy of this website is attached hereto as Exhibit F.

46.     Carignan's employment at Mariner is in direct violation of the Agreement Ancillary and. Further, Carignan's solicitation of CPA firm clients and end-user clients that he serviced on behalf of Avantax is in direct violation of the Agreement Ancillary. Moreover, Carignan's solicitation of Avantax's CPA firm clients and end-user clients necessarily and inevitably requires him to use, disclose, and rely upon Avantax's trade secrets and other confidential information in violation of the Agreement Ancillary and the Proprietary Agreement. There is no way that Carignan could solicit such Avantax clients without relying on this information, since it is impossible for him to simply disregard his knowledge of this information when meeting with and soliciting the business of these clients.

47.     Although Avantax can identify the amount of assets under management that are lost due to Carignan's unlawful solicitation of these Avantax clients, it is impossible for Avantax to calculate the amount of potential prospective revenue lost based on the fact that the damage extends beyond simply the fee-based revenue that could be calculated from the current assets under management if he is permitted to unlawfully continue his employment with Mariner and solicit the CPA firm clients and end-user clients with which Avantax does business. It is impossible for Avantax to know whether a continued relationship with such clients would have resulted in those clients retaining Avantax for additional fee-generating wealth management services, what other opportunities such a successful relationship may have led to (such as, for example, a referral to other family members or acquaintances of such clients), and how those clients' portfolios would have performed over a lengthy period of time based on the market's performance and the future

14

structure of those clients' specific portfolios under Avantax's management (which could easily differ from how another firm, such as Mariner, might structure the portfolios).

48.    I believe that Carignan continues to rely upon, use, and disclose (and will in the future reply upon, use, and disclose) Avantax's trade secrets and other confidential and proprietary information to Mariner, in violation of the Agreement Ancillary and the Proprietary Agreement.

49.    To my knowledge, Mariner has not taken any action to cease its interference with Carignan's contractual obligations to Avantax by, among other things, demanding that Carignan cease and desist using Avantax's confidential information to contact and solicit Avantax clients in violation of the Agreement Ancillary and the Proprietary Agreement. I further believe that Carignan's continued violations of the Agreement Ancillary and the Proprietary Agreement are plainly with the knowledge, encouragement, intentional procurement, and approval of Mariner. To date, Mariner has not provided any legitimate justification for its intentional and tortious interference with Carignan's contractual obligations owed to Avantax.

50.    Carignan's violation of the Agreement Ancillary and the Proprietary Agreement, along with Mariner's unjustified interference with those contracts, has and will continue to cause Avantax irreparable harm, including loss of business, injury to customer good will, and disclosure of trade secrets and confidential information, as well as incalculable economic damages.

**FURTHER YOUR AFFIANT SAYETH NOT.**

Dated: October 23, 2023

_____
Aaron Maxey

Subscribed and sworn to before me this
_____ day of October, 2023

15

_____
Notary Public

Case 2:24-cv-01002-MAR   Document 1-2   Filed 01/11/24   Page 103 of 130

# Exhibit A

DocuSign Envelope ID: 5C7AAABC-0155-42B7-AD84-048E3E2985EF

**AGREEMENT ANCILLARY TO EMPLOYMENT**

This AGREEMENT is made effective as of ___July 18, 2016___, 2016, by and between HK FINANCIAL SERVICES, INC ("Employer") and ___MICHAEL CARIGNAN___ ("Employee").

<u>Recitals</u>

A.  Employer is in the business of providing the following services: bookkeeping, public accounting, income tax preparation, data processing including payroll and payroll related services, financial planning, computer consulting, human resources consulting, and business consulting (hereinafter referred to as "Employer's Business"); and

B.  At the time of execution and delivery of this Agreement, Employee has previously accepted employment with Employer and has also executed an Employment Agreement of even date herewith (the "Employment Agreement"); and

C.  Any continued employment of Employee will:
   1)  require the expenditure of time and money by Employer in the training and preparation of Employee; and
   2)  entail the divulging to Employee of various secrets and information as to the confidential methods and procedures of Employer relating to bookkeeping, accounting, income tax preparation, and data processing and the application thereof to specific clients of Employer; and
   3)  bring Employee into personal contact with certain of Employer's clients; and

D.  Employer and Employee recognize that the aforesaid training and preparation, divulging of confidential information, application of confidential methods and procedures, and client contacts are matters of value which could be misused by Employee either during or after Employee's term of employment, and each desires that Employer be protected from such misuse; and

E.  Employer and Employee have agreed upon the terms and conditions contained in this Agreement to protect Employer from potential misuse of confidential information as described above; and

F.  Employer would not have continued to employ Employee (for an undetermined period of time) but for Employee's covenants and undertakings contained herein.

<u>Agreement</u>

In consideration of the foregoing premises, mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.  <u>Non-disclosure of Information</u>. Employee covenants and agrees that he/she will not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to him/her as a result of his/her employment either before or after the date hereof by Employer. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to Employer, including, but not be limited to, information relating to such matters as Employer's trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of Employer, pricing practices for Employer's services, marketing and sales practices of Employer, financial information relative to Employer, any other information which could prove beneficial in enabling a competitor to compete with Employer, and all other information related to Employer's Business.

Employee agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to Employer's operations and business, whether prepared by Employee or not, and all objects associated therewith, including, but not limited to,

access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by Employer, are the sole and exclusive property of Employer. Employee shall not, except for Employer use, copy or duplicate any of the aforementioned items, nor remove them from the Employer's facilities, nor use any information concerning them, except for Employer's benefit, either during the term of this Agreement or thereafter. Employee expressly agrees to deliver all of the aforementioned items in his/her possession to Employer on termination of this Agreement, or at any other time on Employer's request, together with Employee's written certification of compliance.

2. <u>Anti-Piracy Covenants</u>.   Employee acknowledges that the services he/she is to render pursuant to this Agreement are of a special character with a unique value to Employer, the loss of which cannot adequately be compensated by damages in an action at law.  In view of the unique value to Employer of the services of Employee for which Employer has contracted hereunder and because of the confidential information to be obtained by or disclosed to Employee, Employee covenants and agrees as follows:

    a) Notwithstanding and in addition to the above, during Employee's employment and for a period of two years after he/she ceases to be employed by Employer, Employee shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by Employer, any client, account or location of Employer with which Employer has had any contact as a result of his/her employment either before or after the date hereof by Employer, including clients with respect to whom Employee performed professional services prior to his/her employment with Employer.

    b) During Employee's employment and for a period of two years after he/she ceases to be employed by Employer (for any reason whatsoever), Employee shall not, directly or indirectly, solicit for employment or employ any employee of Employer, nor shall Employee, directly or indirectly, offer employment or assist any third party in offering employment (whether as an employee or contractor) to an employee of Employer, without the prior written consent of Employer.  For purposes of this paragraph 2(b), an "employee of Employer" shall be any employee of Employer as of the date Employee ceases to be employed by Employer or any such employee of Employer who was employed by Employer during the one-year period prior to Employee's termination of employment with Employer.

3. <u>Liquidated Damages.</u> Employee agrees that violation of any of the covenants or agreements contained in paragraphs 1 or 2 hereof shall cause damage to Employer, which damage may be difficult to subsequently demonstrate. Consequently, the parties acknowledge and agree that for each breach of this Agreement that results in the loss of one or more of Employer's clients, Employee shall pay liquidated damages, for each and every client lost by Employee's breach of this Agreement, in an amount equal to the regularly occurring annual fee that would have been earned by such lost client (based upon the most recent annual fee for recurring services charged to such client).  Additionally, the parties hereto agree and acknowledge that for each breach of paragraph 2(b) herein, Employee shall pay to Employer liquidated damages equal to fifty percent (50%) of the annual compensation paid to such employee during the during the twelve (12) month period immediately preceding such employee's termination of employment with Employer, or the twelve (12) month period immediately preceding such solicitation of employee, as the case may be.  Employee acknowledges that such liquidated damages are fair and reasonable in light of the anticipated or actual loss that would be caused by a breach of this Agreement. The remedies provided for in this paragraph 3 shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Employer is or may be entitled at law or in equity or under this Agreement.

4. <u>Reasonableness of Restrictions</u>. Employee has carefully read and considered the provisions of paragraphs 1, 2 and 3 and agrees that the restrictions set forth in such paragraphs are fair and reasonable and are reasonably required for the protection of the interests of Employer.

DocuSign Envelope ID: 5C7AAABC-0155-42B7-AD84-048E3E2985EF

5. <u>Injunctive Relief</u>. It is agreed that violation by Employee of any of the provisions hereof shall cause immediate and irreparable injury to Employer which will authorize immediate recourse to legal or equitable remedy of injunction, including temporary injunction, or specific performance or both, as well as to all other remedies to which Employer may be entitled.

6. <u>Reformation by Court</u>. If Employer, its successors or assigns, shall bring an action for the enforcement of any or all provisions of this Agreement, and if the court shall find on the basis of evidence introduced in said action that this Agreement is unreasonable, then the court shall make a finding as to what is reasonable and enforce this Agreement by judgment or decree to the extent of such findings.

7. <u>Benefit</u>. This Agreement shall inure to the benefit of the successors and assigns of Employer, including any partnership or corporate entity succeeding to Employer's Business by reason of contractual commitments or legal transfer of Employer's Business now or hereafter effected.

8. <u>At-Will Employment</u>. Nothing in this Agreement constitutes any guarantee of continued employment, express or implied. Employee agrees that he/she has no reason or basis for any expectations of ongoing or indefinite employment by Employer or employment for a specific term, and each party hereby acknowledges that Employee's employment is strictly at-will, subject to termination by either party at any time, for any reason or for no reason.

9. <u>Miscellaneous</u>. This Agreement shall be binding upon Employee and his/her heirs, personal representatives, successors and assigns. Any termination of Employee's employment or this Agreement will not terminate or otherwise affect the enforceability of the obligations of the Employee hereunder. The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa. The invalidity or unenforceability of any one or more of the provisions of this Agreement shall not affect the validity and enforceability of the other provisions. This Agreement supersedes all prior discussions and agreements between Employer and Employee with respect to the subject matter hereof. This Agreement cannot be changed or modified or any performance or condition waived, in whole or in part, except by a writing signed by the party against whom enforcement of the change, modification or waiver is sought. The waiver of any breach of any term or condition of this Agreement shall not be deemed to constitute the waiver of any other breach of the same or any other term or condition.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first above written.

HK FINANCIAL SERVICES, INC
Employer
By_____
John R. Darrah, Chief Executive Officer

_____   July 18, 2016
Employee                              Date

# Exhibit B

DocuSign Envelope ID: B70CAA4F-ABAE-4EC8-8CC4-A84C68AC47AB

 

## EMPLOYEE PROPRIETARY INFORMATION AGREEMENT

In consideration and as a condition of employment, or continuing employment, by Honkamp Krueger & Co., P.C. and HK Financial Services, Inc. and/or by companies which it owns, controls, or is affiliated with, or their successors in business (the "Company"), and the compensation paid therefore:

1. <u>Confidentiality</u>
   I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose, or make any use of except from the benefit of the Company, at any time either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of the Company relating to products, processes, know-how, designs, customer lists, business plans, marketing plans and strategies, and pricing strategies, or any subject matter pertaining to any business of the Company or any of its clients, licensees, or affiliates, which I may produce, obtain, or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company.

   I agree to take all reasonable good faith efforts to only access information of Company that is relevant to the performance of my employment responsibilities with Company, and which information has a specific business purpose related to my employment with Company, unless I have otherwise been granted specific authorization by the Company to access any such information. In the event I access information of Company to which I am unauthorized to access, I agree that I shall immediately in writing contact my department manager or partner to report such unauthorized access.

2. <u>Conflicting Employment; Return of Confidential Material</u>
   I agree that during my employment with the Company, I will not engage in any other employment, occupation, consulting, or other activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company. In the event of my termination of employment with the Company for any reason whatsoever, I agree to promptly surrender and deliver to the Company all records, materials, equipment, drawings, and data of any nature pertaining to any invention or confidential information of the Company or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge, or data of the Company which I may produce or obtain during the course of my employment.

3. <u>Maintenance of Records</u>
   I agree to keep and maintain adequate and current written records of all sales and customer transactions, which records shall be available to and remain the sole property of the Company at all times.

*Updated May 2019*

4. <u>Modification</u>
This agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by the employee and the Company. I agree that any subsequent change or changes in my duties, salary or compensation shall not effect the validity or scope of this agreement.

5. <u>Entire Agreement</u>
I acknowledge receipt of this agreement, and agree that with respect to the subject matter thereof, it is my entire agreement with the Company, superseding any previous oral or written communications, representation, understandings, or agreements with the Company or any officer or representative thereof.

Notwithstanding any provision herein to the contrary, I agree and acknowledge that any separate agreement ancillary to employment to which I am a party will also be binding and continue in full force and effect. I agree and acknowledge that this Agreement replaces and supersedes any prior Employee Proprietary Information Agreement to which I may be a party.

6. <u>Severability</u>
In the event that any paragraph or provision of this agreement shall be held to be illegal or unenforceable, such paragraph or provision shall be severed from this agreement and the entire agreement shall not fail on account thereof, but shall otherwise remain in full force and effect.

7. <u>Successors and Assigns</u>
This agreement shall be binding upon my heirs, executors, administrators, or other legal representatives and is for the benefit of the Company, its successors and assigns.

8. <u>Governing Law</u>
This agreement shall be governed by the laws of the State of Iowa.

9. <u>Counterparts</u>
This agreement shall be signed in two counterparts, each of which shall be deemed an original and both of which shall together constitute one agreement.

Dated: June 20, 2019
_____

Accepted and Agreed By:

MICHAEL CARIGNAN
_____
Employee Name (Print)

DocuSigned by:
*MICHAEL CARIGNAN*
5AE39750FB698AB...
_____
Employee Signature

*Updated May 2019*



## Certificate Of Completion

Envelope Id: B70CAA4FABAE4EC88CC4A84C68AC47AB

Status: Completed

Subject: Please DocuSign: employee proprietary agreement

FlowID: HRProprietary

SalesforceID:

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 2 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Teri Pitzen |
| AutoNav: Enabled | | 2345 John F Kennedy Rd |
| EnvelopeId Stamping: Enabled | | Dubuque , IA  52002 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | tpitzen@honkamp.com |
| | | IP Address: 65.125.111.3 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Teri Pitzen | Location: DocuSign |
|     6/14/2019 11:56:59 AM |     tpitzen@honkamp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| MICHAEL CARIGNAN<br>mcarignan@hkfs.com<br>Security Level: Email, Account Authentication (None) | *MICHAEL CARIGNAN*<br>—5AE59750FB694AB...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 70.130.117.255 | Sent: 6/14/2019 11:57:00 AM<br>Viewed: 6/20/2019 1:02:59 PM<br>Signed: 6/20/2019 1:04:28 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 6/20/2019 1:02:59 PM<br>    ID: ab5b4730-bb6f-46b1-8e34-baebd05c22bb | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/14/2019 11:57:00 AM |
| Certified Delivered | Security Checked | 6/20/2019 1:02:59 PM |
| Signing Complete | Security Checked | 6/20/2019 1:04:28 PM |
| Completed | Security Checked | 6/20/2019 1:04:28 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**
From time to time, Honkamp Krueger & Co., P.C. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**
At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we have sent to you through your DocuSign user account for a limited period of time (usually approximately 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**
If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**
If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**
Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Honkamp Krueger & Co., P.C.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

 To contact us by email send messages to: info@honkamp.com


**To advise Honkamp Krueger & Co., P.C. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at info@honkamp.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Honkamp Krueger & Co., P.C.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to info@honkamp.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Honkamp Krueger & Co., P.C.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to info@honkamp.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000 or WindowsXP |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0 or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies <br><br> •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change at the sole discretion of HK. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software

requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Honkamp Krueger & Co., P.C. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Honkamp Krueger & Co., P.C. during the course of my relationship with you; and

- I shall not hold HK liable for any direct or indirect damages incurred, including, without limitation, any special, incidental or consequential damages, or any other damages, including damages for loss of profits or business interruption, arising out of or related to any malfunction of the Docusign software outside the control of HK, or otherwise resulting from my failure to diligently check my email or to print off paper copies as may be necessary for my use.

# Exhibit C

September 29, 2023

**VIA EMAIL & CERTIFIED MAIL**

Aaron Maxey
Director, Financial Planning Consultant
Avantax
3200 Olympus Blvd., Suite 100
Dallas, TX 75019

RE:     Resignation

Dear Aaron:

I hereby terminate my employment and association with Avantax Wealth Management, Avantax Advisory Services, and Avantax Investment Services, (collectively "Avantax"), effective immediately.

It is my intention to affiliate with Mariner, LLC dba Mariner Wealth Advisors. In this regard, my contact information will be:

400 Northridge, Suite 425
Atlanta, GA 30350
Tel.: (470) 462-2708
Email: mike.carignan@marinerwealthadvisors.com

I am providing my contact information, consistent with FINRA Regulatory Notice 19-10, issued on April 5, 2019, so that Avantax may instruct its representatives to provide this information in response to client questions concerning my departure from the firm.

Although I do not anticipate any difficulties, if there are any legal matters that require my attention, you are directed to contact my attorney directly using the following information:

Katie M. Connolly, Esq.
Nilan Johnson Lewis, P.A.
kconnolly@nilanjohnson.com
Tel.: (612) 305-7546

Upon filing a Form U5 evidencing my voluntary termination, please forward a copy to my address listed above.

Finally, I will await instructions for the return of my Avantax laptop or other equipment currently in my possession. Please note that I have taken measures to remove information Avantax could reasonably consider its confidential information from my personal devices, including retaining a third party forensics expert to assist.

Yours truly,

Michael Carignan

# Exhibit D



**Littler Mendelson, PC**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136

Jeremy D. Sosna
612.313.7606 direct
612.630.1000 main
612.677.3106 fax
jsosna@littler.com

October 20, 2023

<u>**VIA E-MAIL ONLY**</u>

Mr. Marty Bicknell
Mariner Wealth Advisors, LLC
5700 W. 112th Street, Ste. 200
Overland Park, KS 66211

*Re:      Employment Agreements of Michael Carignan - <u>CEASE AND DESIST</u>*

Dear Mr. Bicknell:

We represent Avantax Planning Partners, Inc. ("Avantax") and Avantax, Inc. with regard to Mike Carignan's ongoing violations of certain agreements he has with Avantax, including his Agreement Ancillary to Employment (the "Ancillary Agreement") and the Employee Proprietary Information Agreement (the "Proprietary Information Agreement") (collectively referred to herein as the "Agreements"). It has come to our attention that Mr. Carignan recently left employment with Avantax and has engaged in an ongoing pattern of breaches of the Agreements by, among other things, soliciting Avantax clients on behalf of Mariner, LLC, d/b/a/ Mariner Wealth Advisors ("Mariner") and interfering with Avantax's agreements and business expectancies with its business partners, all while using Avantax trade secrets and other confidential and proprietary information. As set forth below, we are writing to you to: (1) place Mariner on notice of Mr. Carignan's continuing obligations to Avantax under the Agreements and law; and (2) demand that Mariner immediately **cease and desist** its interference with Mr. Carignan's legal and contractual obligations owed to Avantax. Please be advised that Avantax takes this matter very seriously and will not tolerate either Mr. Carignan's violations of his obligations to Avantax under the Agreements or Mariner's further interference with Avantax's rights pursuant to the Agreements.

It is our understanding that Mariner has received and is already fully aware of the Agreements and Mr. Carignan's obligations thereunder. Nonetheless, I direct your attention to Sections 1, 2, and 3 of the Ancillary Agreement and Sections 1 and 2 of the Proprietary Information Agreement. The Agreements generally prohibit Mr. Carignan from (a) using or disclosing Avantax's Confidential Information (as defined in the Agreements) for the benefit of any third-party and (b) directly or indirectly soliciting, assisting in the solicitation of, or accepting the business of, any Avantax client or prospective client following the termination of his employment.

The restrictive covenants contained in the Agreements are reasonable, valid and enforceable under Iowa law (which governs the Agreements). Iowa courts routinely uphold such reasonable non-solicitation

agreements and are authorized to enter, and regularly do enter, injunctions to prevent violations of such restrictive covenants, as well as to prevent the intentional and tortious interference with such contractual obligations by a third-party such as Mariner. Moreover, Iowa courts are authorized to grant other relief (including monetary relief) to remedy the tortious interference with a party's rights under a contract by a third-party. It was and is Avantax's full expectation that Mr. Carignan would strictly comply with each and every provision in the Agreements, including the above-referenced restrictions on Mr. Carignan's post-employment activities — covenants to which Mr. Carignan voluntarily agreed in exchange for his continued employment relationship with Avantax, access to Avantax's trade secrets and other confidential and proprietary information, and the valuable compensation and benefits he enjoyed as a result of that employment.

We are now aware that Mr. Carignan has not lived up to his promises to Avantax and that Mariner has knowingly procured Mr. Carignan's breach of the Agreements by permitting him to solicit and accept business with Avantax's clients and prospective clients. Avantax has learned that Mr. Carignan has commenced employment with Mariner and has actively solicited numerous Avantax clients to end their relationship with Avantax and move the clients' business to Mariner, with Mariner's apparent full knowledge that Mr. Carignan's activities are in violation of the Agreements and his other legal obligations. It cannot seriously be disputed that Mr. Carignan's actions are in direct breach of his obligations to Avantax pursuant to the Agreements. Avantax is very confident that the evidence of Mr. Carignan's violations, including his unlawful solicitation of Avantax clients, will be overwhelming and that Avantax will prevail in proving breaches of the Agreements by Mr. Carignan.

Avantax further has information and believes that Mariner had full knowledge of Mr. Carignan's legal obligations to Avantax pursuant to the Agreements when it hired Mr. Carignan and allowed him to solicit Avantax customers on Mariner's behalf using Avantax's trade secrets and confidential information, all in violation of the Agreements. Mariner has not only knowingly tolerated these breaches of the Agreement by Mr. Carignan, but Avantax has information showing that Mariner has actively supported Mr. Carignan's breaches and efforts to steal Avantax's clients without any legal justification whatsoever, including by having members of Mariner's client acquisition team contact Avantax clients and business partners on Mr. Carignan's behalf. Under Iowa law, Mariner can be held liable for intentionally interfering with the contract between Mr. Carignan and Avantax based upon Mariner's knowledge and procurement of Mr. Carignan's breaches of the valid and enforceable Agreements without any valid justification, as well as based on Mariner's misappropriation of Avantax's trade secrets.

**This matter demands Mariner's immediate attention**. Avantax takes Mr. Carignan's violations of the Agreements very seriously and will not tolerate any further breach of Mr. Carignan's obligations owed to Avantax *or* Mariner's continued interference with those obligations under the Agreements. While Avantax hopes to avoid a legal dispute with Mariner, Avantax has suffered and continues to suffer irreparable harm due to, among other things, the loss of its goodwill and customer relationships that Avantax paid Mr. Carignan handsomely to cultivate on its behalf. Moreover, the irreparable harm and financial losses to Avantax as a result of Mr. Carignan's breaches of the Agreements will continue in the future unless Mariner ceases in procuring Mr. Carignan's breach of the Agreements – Avantax will lose the opportunity to continue relationships with clients in the future and enjoy the financial benefits (of unknown quantity)

generated by the goodwill and client relationships that, but for Mariner's procurement of Mr. Carignan's unlawful conduct, Avantax could reasonably have been expected to continue indefinitely.

Accordingly, Avantax demands that Mariner **immediately cease and desist** with its interference with the Agreements between Avantax and Mr. Carignan. This letter constitutes Avantax's only and final effort to secure Mariner's compliance with its legal obligation to not interfere with Avantax's rights under the Agreements. Avantax welcomes a satisfactory response from Mariner by **close of business on October 25, 2023**. Notwithstanding, Avantax retains the right to consider all available legal remedies against Mariner to enforce its rights to the maximum extent permitted by law.

We trust that Mariner understands the importance of this matter and thank you in advance for your cooperation. We look forward to your prompt response.

Sincerely,

*/s/ Jeremy D. Sosna*

Jeremy D. Sosna
Shareholder

cc:     Ms. Tabitha Bailey
        Ms. Jennifer Wang
        Mr. Louie Rosalez
        Ms. Katie Connolly

4861-5602-1636.2 / 109298-1001

# Exhibit E



Littler Mendelson, PC
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136

Jeremy D. Sosna
612.313.7606 direct
612.630.1000 main
612.677.3106 fax
jsosna@littler.com

October 20, 2023

**VIA E-MAIL ONLY**

Ms. Katie Connolly
Nilan Johnson Lewis PA
250 Marquette Ave. S, Ste. 800
Minneapolis, MN 55401
kconnolly@nilanjohnson.com

*Re:*     ***Employment Agreements of Michael Carignan - <u>CEASE AND DESIST</u>***

Dear Ms. Connolly:

We represent Avantax Planning Partners, Inc. ("Avantax") and Avantax, Inc. with regard to Michael Carignan's ongoing violations of his Agreement Ancillary to Employment (the "Ancillary Agreement") and Employee Proprietary Information Agreement (the "Proprietary Information Agreement") (collectively referred to herein as the "Agreements") with Avantax. It has come to our attention that Mr. Carignan is in breach of these Agreements by, among other things, soliciting Avantax clients on behalf of Mariner, LLC, d/b/a/ Mariner Wealth Advisors ("Mariner"), interfering with Avantax's contracts and business expectancies with its clients and business partners, and misappropriating Avantax's trade secrets and other confidential and proprietary information. As set forth below, we are writing to you as counsel for Mr. Carignan to (1) place Mr. Carignan on notice of his continuing obligations to Avantax under the Agreements; and (2) demand that Mr. Carignan immediately **cease and desist** with further breaches of his legal and contractual obligations owed to Avantax. Please be advised that Avantax takes this matter very seriously and will not tolerate either Mr. Carignan's violations of his obligations to Avantax under the Agreements or Mariner's further interference with Avantax's rights pursuant to the Agreements.

We direct your attention to Sections 1, 2, and 3 of the Ancillary Agreement and Sections 1 and 2 of the Proprietary Information Agreement. Among other things, the Agreements prohibit Mr. Carignan from (a) using or disclosing Avantax's Confidential Information (as defined in the Agreements) for the benefit of any third-party and (b) directly or indirectly soliciting, assisting in the solicitation of, or accepting the business of any Avantax client or prospective client following the termination of his employment (including CPAs with which he had contact or about which he learned confidential information while employed).

The restrictive covenants contained in the Agreements are reasonable, valid, and enforceable under Iowa law (which governs the Agreements). Iowa courts routinely uphold such reasonable restrictive covenants and are authorized to enter, and regularly do enter, injunctions to prevent violations of such restrictive

covenants, as well as to prevent the intentional and tortious interference with such contractual obligations by a third-party such as Mariner. It was and is Avantax's full expectation that Mr. Carignan will strictly comply with each and every provision in the Agreements, including the above-referenced restrictions on Mr. Carignan's post-employment activities —covenants to which Mr. Carignan voluntarily agreed in exchange for continued employment relationship with Avantax, access to Avantax's trade secrets and other confidential and proprietary information, training, and the valuable compensation and benefits he enjoyed as a result of that employment.

We are now aware that Mr. Carignan has not lived up to his promises to Avantax. Avantax has learned that Mr. Carignan has commenced employment with Mariner and has actively solicited Avantax clients to end their relationship with Avantax and move the clients' business to Mariner, with Mariner's apparent full knowledge that Mr. Carignan's activities are in violation of the Agreements. It cannot seriously be disputed that Mr. Carignan's actions are in direct breach of his obligations to Avantax pursuant to the Agreements. Avantax is very confident that the evidence of Mr. Carignan's violations, including his unlawful solicitation of Avantax clients, will be overwhelming and that Avantax will prevail in proving breaches of the Agreements by Mr. Carignan. To be clear, Avantax cannot and will not tolerate any further breaches by Mr. Carignan of his legal obligations to Avantax and is prepared to bring legal action against Mr. Carignan and Mariner to vindicate its legal rights. Of course, if our information regarding Mr. Carignan's solicitation of Avantax clients on Mariner's behalf is incorrect, we request that you advise us accordingly so that we may further evaluate Mr. Carignan's compliance with the Agreements.

Avantax also maintains trade secrets that Mr. Carignan is legally prohibited from disclosing to any person without Avantax's consent, either during or subsequent to employment. State and federal laws protect Avantax's trade secrets and other confidential information from such misappropriation and improper disclosure. Both the Iowa Uniformed Trade Secrets Act and the federal Defend Trade Secrets Act protect against actual or threatened disclosure of trade secrets and provide Avantax the right to obtain both injunctive relief and damages. The trade secrets and other confidential and proprietary information owned and maintained by Avantax are critical to and a significant source of the Company's competitive advantage in the marketplace. Such trade secrets include highly sensitive information that Mr. Carignan was provided or to which he was given access during his employment, including without limitation information regarding the Company's business and strategy, research and development, marketing techniques, products and services, analytical tools, pricing and margins, and clients (which include CPA firms with which Avantax has relationships), among other things. If such trade secrets were disclosed to a competitor or any other third-party, it would destroy the competitive advantage enjoyed by Avantax and that results from the secrecy of this information. We trust that Mr. Carignan fully understands his obligations and will immediately cease his use, reliance on, and disclosure of any of Avantax's trade secrets and other confidential and proprietary information.

**This matter demands Mariner's immediate attention**. Avantax takes Mr. Carignan's violations of the Agreement very seriously and will not tolerate any further breach of Mr. Carignan's obligations owed to Avantax (or Mariner's continued interference with those obligations under the Agreements). While Avantax hopes to avoid a legal dispute with Mariner, Avantax has suffered and continues to suffer irreparable harm due to, among other things, the loss of its goodwill and customer relationships that

Avantax paid Mr. Carignan handsomely to cultivate on its behalf. Moreover, the irreparable harm and financial losses to Avantax as a result of Mr. Carignan's breaches of the Agreement will continue into the future unless Mr. Carignan immediately ceases in his breaches of the Agreement – Avantax will lose the opportunity to continue relationships with clients in the future and enjoy the financial benefits (of unknown quantity) generated by the goodwill and client relationships that, but for Mr. Carignan's unlawful conduct, Avantax could reasonably have been expected to continue indefinitely.

Accordingly, Avantax demands that Mr. Carignan **immediately cease and desist** with his interference with the Agreements with Avantax. This letter constitutes Avantax's final effort to secure Mr. Carignan's compliance with his legal obligation to Avantax under the Agreements. Avantax welcomes a satisfactory response from Mr. Carignan by **close of business on October 25, 2023**. Notwithstanding, Avantax retains the right to consider all available legal remedies against Mr. Carignan and Mariner to enforce its rights to the maximum extent permitted by law.

In addition, this letter constitutes notice to Mr. Carignan and Mariner to preserve documents and information relevant to Avantax's claims. Avantax specifically demands that **Mr. Carignan and Mariner preserve, and not alter, delete, or destroy** (and that Mariner ensures that each of its affiliates, employees, representatives, agents, and anyone acting with Mariner preserves, and does not alter, delete or destroy) **any and all documents or electronically-stored information[1] in your or its possession, custody, or control concerning, relating to, or involving any of the following**:

---

[1] The term "documents" and "electronically-stored information" shall be construed to have the broadest meaning possible, and shall include all written, electronic, typewritten, handwritten, recorded, or printed matter or material of any kind, including the originals and all identical and/or non-identical copies thereof, including any non-identical copies different from the originals by reason of any notation made on such copies or otherwise, including without limitation, minutes and/or other records of meetings, agendas, bills, contracts, leases, assignments, agreements, summaries of negotiation, account books, orders, invoices, statements, checks, accounting records, summaries, diaries, forecasts, studies, charts, reports, and/or summaries of investigations or reports, press releases, statements of policy, correspondence, letters, interoffice and intra-office communications, offers, notations of any sort of conversations, appointment books, day planners, calendars or other appointment or activity schedule, faxes, confirmations, computer files, cloud computing data (including, but not limited to iCloud, iTunes, Google Drive, DropBox, and Hightail); printouts of computer files, computer data, emails, text messages, instant messages, chats, MMS messages, SMS messages, Skype messages, social media postings or messages, all graphic or manual records or representations of any kind, including without limitation, photographs, microfiche, microfilm, video tape, records, motion pictures, and electronic, mechanical or electric records or representations of any kind, including tapes, cassettes, disks, magnetic cards, and recordings; all drafts, alternations, modifications, changes and amendments of any of the foregoing; and all other similar material which is in the possession, custody, or control of you, Mariner, or Mariner's employees, agents, or representatives. Without limiting the term "control" as used in the preceding sentence, a document or ESI shall be deemed to be within the control of Mr. Carignan or Mariner, regardless of physical location, if such entity or individual has the right to secure the document or ESI from another person or entity, either public or private, including, but limited to, such person or entity's legal counsel, having possession thereof. Please ensure that all of your and Mariner's agents and representatives have taken all steps necessary to comply with these obligations.

1. Communications between Mr. Carignan and Mariner, or anyone on Mariner's behalf, at any time;

2. Communications between Mr. Carignan and any client of Avantax or Mariner (including any CPA firms with whom Avantax had a relationship during Mr. Carignan's employment);

3. Communications between Mr. Carignan and any other current or former Avantax employee;

4. Interviews, meetings, or calls with any current or former Avantax employee, including Mr. Carignan, at any time;

5. Documents relating to or referencing any current or former Avantax employee;

6. Documents regarding the Mr. Carignan's or any other current or former Avantax employee's potential, prospective, or actual employment with Mariner, including without limitation all Documents relating to the solicitation, recruitment, or hiring of any current or former Avantax employee;

7. Any documents, electronic equipment, devices, digital media storage devices, or drives provided by Mr. Carignan or any current or former Avantax employee to Mariner, or anyone on Mariner's behalf;

8. Documents relating to or referencing Avantax's business;

9. Documents relating to or referencing Avantax's employees or clients (including without limitation any CPA firm with which Avantax had any relationship or prospective relationship during Mr. Carignan's employment);

10. Avantax's confidential, proprietary, and trade secret information, including, but not limited to, any Avantax employee or client information (including without limitation any CPA firm with which Avantax had any relationship or prospective relationship during Mr. Carignan's employment); and

11. Mr. Carignan's or any current or former Avantax employee's activities on behalf of Mariner.

Please confirm in writing by no later than close of business on <u>October 25, 2023</u>, that Mr. Carignan and Mariner have taken all steps necessary to preserve such documents and electronically-stored information.

We trust that Mr. Carignan understands the importance of this matter and will govern himself accordingly. We look forward to your prompt response.

Sincerely,

*/s/ Jeremy D. Sosna*

Jeremy D. Sosna
Shareholder

JDS/rnl

cc:     Ms. Tabitha Bailey
        Ms. Jennifer Wang
        Mr. Louie Rosalez
        Mr. Marty Bicknell

4885-9114-9188.2 / 109298-1000

# Exhibit F





 mike.carignan@mariner wealthadvisors.com

470-462-2708

# Designations and Licenses

Mike is a CERTIFIED FINANCIAL PLANNER™ professional and holds life, health and variable annuity insurance licenses.

# Experience and Education

Mike serves as a trusted partner to clients, helping them create a plan to reach their financial goals today, tomorrow and in the future. In addition, he specializes in working with a client's CPA to provide wealth planning and investment strategies that integrate estate planning, risk management and retirement planning into a customized wealth plan.

Prior to joining Mariner Wealth Advisors, Mike was a financial planning consultant at Avantax Planning Partners and HK Financial Services.

Mike has a bachelor's degree in biology from The Citadel – The Military College of South Carolina.

## Personal Interests

Away from the office, Mike enjoys attending his boys' athletic events, golfing, camping and spending time with family. Additionally, because he has two sons in the U.S. Army, he supports a variety of military-centered charities.

## Mike's Office

400 Northridge Rd.
Suite 425
Atlanta, GA 30350

**470-575-0221**

Case 2:24-cv-01002-MAR    Document 1-2    Filed 01/11/24    Page 129 of 130